In the Matter of the Application of S. LUNGHINO & SONS, Private Bankers, Respondents, for an Order Requiring the Superintendent of Banks to Discontinue Possession of the Business and Property of S. LUNGHINO & SONS, and Requiring Him to Surrender Such Possession to Them.

EUGENE LAMB RICHARDS, Superintendent of Banks of the State of New York, Appellant.

Fourth Department, January 10, 1917.

Banks — right of State Superintendent of Banks to refuse certificate permitting private bankers to do business — Banking Law construed — respective powers of Superintendent of Banks and Supreme Court — power of court under Banking Law, section 60 — court cannot prescribe conditions upon which private bankers shall be allowed to do business.

Application to the court under section 60 of the Banking Law by private bankers doing business as copartners to obtain an order requiring the State Superintendent of Banks to discontinue possession of the said banking business and to surrender the same to the petitioners.    The

State Superintendent, under the authority of the Banking Law, as amended by chapter 369 of the Laws of 1914, had investigated the affairs of said private bankers, had refused a certificate to do business upon the ground that the banking methods were unsound, that the capital was impaired and that the business was in fact insolvent, and had taken possession of the business under the authority of the statute. Evidence examined, and *held*, that the acts of the bankers, which included, among other things, stock speculation with the capital, an agreement which permitted one member of the firm to withdraw alleged capital at any time without the consent of his fellow-partners, the appropriation of the firm's property and income to the individual use of a partner, were abhorrent to legitimate banking, in addition to the fact that the firm's capital was seriously impaired and that the State Superintendent of Banks was fully justified in refusing a certificate allowing the partners to do business and in taking possession thereof.

The Legislature has conferred solely upon the State Superintendent of Banks the power to grant or withhold in his sound discretion a certificate permitting private bankers to do business and no power to review such discretion is conferred upon the court.

Section 60 of the Banking Law, providing that, after the State Superintendent has taken possession of the business of such private bankers, they may apply to the court for an order requiring the Superintendent to show cause why he should not be enjoined from continuing such possession and empowering the court "upon good cause shown" to direct the Superintendent to refrain from further proceeding and to surrender possession, should not be construed to empower the court to order the State Superintendent to surrender possession if the bankers fulfill certain conditions prescribed by the court itself.

Said section 60 merely gives the Supreme Court the right to review the action of the Superintendent of Banks in taking possession of the bank. If it is made to appear that he acted arbitrarily and without good cause, or that there has been an abuse of discretion, the court may order that possession be surrendered. But where the court itself determines that the Superintendent was justified in taking possession by the acts of the bankers, it cannot determine the conditions upon which possession shall be surrendered by the Superintendent.

The erroneous order of the court will not be sustained on the theory that the questions involved have become academic since the proceeding was instituted, by reason of the fact that a rise in the market value of securities held by the bankers has rendered the partnership solvent. On the contrary, the possessions of the bank should be returned to the State Superintendent for such action in the premises as he may deem expedient in accordance with the statutes in such case made and provided.

KRUSE, P. J., dissented, with memorandum.

APPEAL by Eugene Lamb Richards, as Superintendent of Banks of the State of New York, from an order of the Supreme

Court, made at the Erie Special Term and entered in the office of the clerk of the county of Erie on the 3d day of April, 1915, granting the application of the respondents and ordering him to refrain from further proceedings in respect to the liquidation of the assets of said firm.

Also a motion by the respondent to dismiss the appeal.

*Louis L. Babcock* [*Rogers, Locke & Babcock,* attorneys], for the appellant.

*Daniel J. Kenefick* [*Kenefick, Cooke, Mitchell & Bass,* attorneys], for the respondents.

MERRELL, J.:

The respondents, S. Lunghino & Sons, are private bankers, engaged as copartners in banking business in the cities of Buffalo and Rochester in this State. The business was originally organized and for over twenty years prior to July, 1911, had been successfully carried on by Sebastian Lunghino as a private banking institution. On said date Sebastian Lunghino retired from active participation in the affairs of the bank, and a copartnership was formed consisting of Sebastian, the father, and his three sons, Joseph J., Donatus, and Anthony S. Lunghino. The articles of copartnership provided that such copartnership should commence on July 1, 1911, and continue for the period of twenty years, its principal place of business being located at 35 State street, Buffalo, N. Y., with a branch at 523 North street in the city of Rochester, N. Y.; that the capital stock should be $50,000, of which the father, Sebastian Lunghino, was to contribute $25,000, Joseph J. Lunghino $15,000, Donatus Lunghino $5,000, and Anthony S. Lunghino $5,000. The articles of copartnership further provided that the copartners should draw and receive for their services the following monthly salaries respectively: Sebastian, $250; Joseph J., $200; Donatus, $150; and Anthony S., $75. By the terms of such agreement it was further provided that the general business management of the affairs of the firm should be intrusted to Joseph J. Lunghino, with "exclusive charge of negotiating, making and executing any and all investments and agreements without any restrictions whatsoever as if he were the sole member of and doing business under the firm name and style of S.

Lunghino & Sons," with express power in said managing copartner, as occasion might arise, to give any promissory note or transfer any corporate securities in his firm's name. Joseph J. Lunghino is and was at the time of the forming of such copartnership an attorney at law, and under the articles of copartnership was permitted to practice his profession at the time he was acting as general manager of the affairs of such copartnership.

Under such business arrangement and from the time of its formation, the said firm of S. Lunghino & Sons appears to have carried on a private banking business at Buffalo and Rochester, pursuant to the General Business Law (Consol. Laws, chap. 20 [Laws of 1909, chap. 25], art. 3a, added by Laws of 1910, chap. 348, as amd. by Laws of 1911, chap. 393), and were so engaged at the time of the enactment by the Legislature of 1914 of statutes bringing the business of private banking under the control and supervision of the State Banking Department. Their depositors were mostly Italians, ignorant of banking business. Prior to the act of 1914, any person or firm could lawfully engage in and carry on a private banking business in this State without authorization from the Banking Department. Such private bankers were not subject to the banking laws of the State, and over them and their banking methods the Superintendent of Banks had no authority or supervision. (See Morgan & Parker's N. Y. Banking Law [ed. 1916], 5, 135.) The result was small depositors often became the prey of irresponsible persons who engaged in the business of private banking, and who solicited and received for deposit principally the small savings of ignorant but credulous foreigners to whom the mere word "bank" was a term indicating stability and security. Failures were not infrequent, and individual losses of depositors were of common occurrence.

By chapter 369 of the Laws of 1914 (Consol. Laws, chap. 2) the Legislature enacted the Banking Law of the State. Under this act were brought private bankers, as distinguished from individual bankers. A private banker was defined by section 2 of the act as "an individual, other than an individual banker, who, by himself, or as a member of a partnership or unincorporated association other than an unincorporated express company * * *, is engaged in the business of receiving deposits

subject to check or for repayment upon the presentation of a pass book, certificate of deposit or other evidence of debt, or upon the request of the depositor, or in the discretion of such individual, partnership or unincorporated association; of receiving money for transmission; of discounting or negotiating promissory notes, drafts, bills of exchange or other evidences of debt; of buying or selling exchange, coin or bullion; or is engaged in the business of transacting any part of such business. The term, 'private banker,' when so used, shall include * * * a partnership or unincorporated association of private bankers."

It is conceded that the business that the respondents had theretofore carried on became subject to the provisions of said act. The act became a law on April 16, 1914, and much of it took effect immediately. Article 4 of the act relates to private bankers. By section 151 such private bankers were required within sixty days after the act took effect to submit to the State Superintendent of Banks a verified certificate in duplicate particularizing as to the personnel of the individual or firm desiring to carry on a private banking business and as to capital invested, business methods and other matters specified in the section. In accordance with such requirement the respondents on or about the 12th day of June, 1914, made and filed with the Superintendent of Banks such verified certificate and applied for an authorization certificate to transact business as private bankers.

Section 23 of the Banking Law further provides: " When any such certificate shall have been filed for examination, the Superintendent shall thereupon ascertain from the best sources of information at his command, and by such investigation as he may deem necessary, whether the character, responsibility and general fitness of the person or persons named in such certificate are such as to command confidence and warrant belief that the business of the proposed * * * private banker * * * will be honestly and efficiently conducted in accordance with the intent and purpose of this chapter, and whether the public convenience and advantage will be promoted by allowing such proposed * * * private banker * * * to engage or continue in business."

Section 23 further provides that after the Superintendent of Banks "shall have satisfied himself by such investigation whether it is expedient and desirable to permit such proposed * * * private banker * * * to engage or continue in business, he shall within sixty days after the date of the filing of such certificate for examination" approve or reject the same, and if he approves the application the statute (§ 24) requires that he shall grant an authorization certificate stating that the private banker has complied with the legal requirements and is authorized to transact such business and that such business can safely be intrusted to such private banker.

Section 152 of the Banking Law further provides that after the 31st day of October, 1914, no private banker should engage or continue in business without such certificate of the State Superintendent of Banks, except that a private banker who was engaged in business at the time the act took effect might continue for one hundred and twenty days after the determination of the Banking Department of his right so to do. This exception was for the purpose of affording protection to private bankers against the failure of the Superintendent to act promptly upon the certificate applied for, and concededly was applicable to respondents.

In accordance with the verified certificate filed by respondents with the Superintendent of Banks on June 13, 1914, the Superintendent took steps to satisfy himself as to the expediency of permitting the respondents to continue in business. No less than four separate examinations were made by examiners connected with the State Banking Department into the affairs of the firm of S. Lunghino & Sons. The first examination was made July 9, 1914. In his report thereon the examiner, save in one or two instances, adopted the valuation of assets placed thereon by respondents. The report indicated a dealing by the bank in purely speculative stocks which the examiner criticised, but on the whole taking the valuations of real estate, various side business enterprises in which the bank was engaged, as given by the firm, the examiner reported that his investigation indicated that the character, responsibility and general fitness of the applicants were such as to command the confidence of the community which they served,

and that public convenience and advantage would be promoted by allowing them to continue in business.    That this preliminary examination was superficial and that the investigations of this first examiner did not disclose to the examiner accurately the true situation of the business affairs of the applicants, seems clear from subsequent examinations made by the department and from circumstances revealed during such investigations.

Not being entirely reassured by the initial examination, the Superintendent caused an experienced examiner from the New York office to look further into the affairs of the applicants. On July 29, 1914, he reported to the Superintendent that a repricing of the firm's securities completely wiped out the claimed surplus of the firm and impaired its capital, and that it would appear that the entire business of the applicants was run as a speculation.    Recommendation was made by this examiner that permission to continue business be refused the applicants until such time as the department could be shown that their capital and surplus were intact and the speculative element of their business eliminated.

On October 3, 1914, a still further examination was made by another examiner sent by the Superintendent of Banks, and on or about October 11, 1914, this examiner made a sworn report to the Superintendent, which showed a deficit of $57,129.71.

On November thirtieth the same examiner made a final examination of the firm's affairs.    This examination revealed that the assets claimed by the applicants were largely fictitious; that inflated valuations had been placed upon properties held by the firm; that its securities were largely speculative stocks, having no stable value; that it had hypothecated its good securities as collateral for loans from other moneyed institutions, and that instead of having an unimpaired capital and surplus as claimed by the applicants the firm was insolvent to the extent of nearly $40,000.    This estimate was based upon a careful appraisal of the assets of the firm and its liabilities.

During the progress of the investigations into the firm's affairs the Superintendent suggested to Joseph J. Lunghino, the firm's general manager, that he raise $50,000 additional

Fourth Department, January, 1917.        [Vol. 176.

funds to insure the bank's financial stability. Acting upon such suggestion Lunghino borrowed from relatives $27,500, and turned the same over to the firm. While the manager claims that this sum was a contribution to the capital of the concern, and that there was only a moral and not a legal obligation on his part to repay it, it clearly appeared that he was personally legally obligated therefor to those from whom it came. Thus it is quite apparent that this sum of borrowed money could not be considered as a contribution of capital in the absence of releases from the parties advancing the funds. Lunghino attempted to supplement his efforts to raise capital, and to comply with the demands of the Superintendent, by obtaining a new appraisal of the firm's real estate, and claims to have obtained an increased valuation thereof of $23,000. This the Superintendent refused to accept as an increase of capital. It further appears that on October 26, 1914, the Superintendent, with a view of protecting innocent depositors, gave the firm positive instructions to segregate all deposits thereafter received, and to place such new deposits in a bank of which they were not borrowers. These instructions were ignored by the firm, although repeated on several occasions, until finally on November 18, 1914, when, in response to the department's insistence, the sum of $4,000 was deposited in the Bankers' Trust Company. The firm thereafter continued to ignore the commands of the Superintendent, notwithstanding oft-repeated directions to segregate such deposits, although professing compliance, until on December 2, 1914, when a second deposit was made, which was the last before the institution was closed. On November 28, 1914, the Superintendent wrote Lunghino, the firm's manager, demanding that an additional capital of not less than $50,000 be put in the business. This the applicants were unable to do, and on December 12, 1914, the Superintendent of Banks refused the certificate applied for, and written notification of such refusal was delivered to the firm's manager on December 14, 1914, and at the same time directing the closing of the bank.

At the time of such action by the Superintendent of Banks his various examinations and investigations had revealed that the business methods of the bank were unsound, and that its

capital was impaired, and that it could · not with safety or expediency continue business. The proper suggestions of the Superintendent were ignored or evaded, and deceit was resorted to by the applicants to conceal the true condition of the firm's affairs. The bank owed its depositors about $304,000. It was owing bills payable to the amount of $154,559.19, making aggregate liabilities of over $458,000. As assets, aside from real estate, the firm held stocks and bonds producing no income, having a market value on December 1, 1914, of only $180,912.75. It held also income-bearing securities to the market value on said date of $151,524.75, but most of these securities had been hypothecated to secure loans. Practically no bankable securities were within the control of the firm. Its expenses were heavy. The salaries of its officers and employees amounted to over $8,000 annually; it paid $10,231.72 on loans to banks and brokers, and upwards of $2,000 interest upon the bank's real estate. Its managing agent, Joseph J. Lunghino, was devoting only a quarter of his time to the bank's business. He confessed that for several years he had speculated in stocks in behalf of the bank, buying stocks and bonds on a margin. He also admitted taking rentals of the bank's real estate which he had not been able to turn over. At the examination of November 30, 1914, personal checks of Joseph J. Lunghino amounting to $905 on another bank were found by the examiner and on presentation at the bank upon which the same were drawn there were funds to pay only one — a check for $170. Moneys were thereupon collected from rents of the firm's real estate and deposited to the credit of Joseph J. Lunghino to meet said checks.

It further appeared by admissions of Joseph J. Lunghino that moneys received from rentals of the firm's real estate, amounting to about $600 to $700 monthly, were deposited to his private account and that he used the money for his private purposes. The examination of Joseph J. Lunghino herein suggests even greater appropriations of the income of the firm's real estate to his own use than he admitted. Indeed, Lunghino professed ignorance as to just how much rent he had turned over to the bank, saying he had kept no record of the rents he had taken in, testifying relative to rentals: "I may

have spent them, the amount of money, as I say, and I may have turned it in, some of it. * * * I didn't keep any record of these rents I have taken in. I may have put it in my pocket and spent it, or may have deposited it, * * *." On his examination, Lunghino, the managing agent, admitted that as frequently as once a week he had been accustomed to draw money from the bank and leave his personal checks as cash. He also admitted as to speculating in stocks with the concern's money, that he had bought and sold securities on a margin in 1911 to the amount of from $80,000 to $90,000; in 1912, to the amount of from $70,000 to $80,000; and in 1913, from $50,000 to $75,000. It also developed upon the hearing of this matter that on the 14th day of April, 1914, but two days before the Banking Law was signed by the Governor, but after it had passed both branches of the Legislature, Joseph J. Lunghino, as party of the first part, entered into a written agreement with the other members of his firm as parties of the second part, whereby, for the alleged purpose of contributing additional capital to their business, the said party of the first part contributed and furnished additional capital consisting of stocks, bonds and other securities and real property having a claimed book value of $63,237.50. The agreement in its 2d, 3d and 4th clauses, provided as follows:

" *Second.* That all gains, profits, increase, income, rents, interest, dividends and accrements, which may be derived from said additional capital hereby contributed or furnished shall be the property of and for the exclusive benefit of the party of the first part, his heirs, administrators, executors and assigns.

"*Third.* In the event of the dissolution of the copartnership business and after the payment of all just claims and demands against the firm, the capital hereby contributed or furnished shall first be set aside and transferred to the party of the first part, his heirs, administrators, executors and assigns, who shall have a preference in the distribution of the capital and surplus of the copartnership before any distribution shall be made to any remaining partner, but such preference shall extend only to the additional capital hereby furnished or contributed by said party of the first part.

" *Fourth.* The party of the first part may, at his election

and without previous notice to the parties herein, withdraw any part or all of the additional capital hereby contributed or furnished. The parties of the second part, for the purpose of effectively releasing any claim or right which they may have in and to said capital and property, do hereby agree to execute any instruments or indentures conveying and transferring said capital to said party of the first part, his heirs, administrators, executors and assigns as said party of the first part shall direct or order."

The terms of this agreement were not brought to the attention of the Superintendent during the pendency of the firm's application for permission to continue business. Its purpose is quite evident. The firm knew that under the law which had passed the Legislature they must obtain the Superintendent's certificate to continue their business, and that to obtain the same they must show an unimpaired capital. They afterwards made such application upon the strength of their capital, knowing that this new contribution could be withdrawn by Joseph J. Lunghino at any moment without notice to his copartners, and knowing that Joseph had merely loaned the alleged capital and still controlled and was entitled to all the gains, profit and income therefrom.

Such were some of the utterly reckless and irresponsible methods of the respondents at the time of the refusal of the Superintendent to grant said firm permission to continue its business. That the existing conditions justified the action of the Superintendent requires no argument. Had he neglected to perform his plain duty under the circumstances he would have deserved severest criticism. He occupied a position of grave responsibility involving the property rights of a large number of industrious saving people. His approval of and certification that the applicants were of sufficient standing, responsibility, character and general fitness to engage in the banking business would serve to most prospective customers as a guaranty of the State government that the bank was financially sound and worthy of public confidence.

The result of the Superintendent's investigations and the attitude of arrogant assurance and disinclination to adopt reasonable suggestions fully justified a withholding of permis-

sion to this firm to transact business as private bankers. Not only was the Superintendent convinced of the instability of the bank, but disapproved as unsafe the character and business methods of the bankers. In assigning his reasons for refusing the certificate asked the Superintendent testified: " My reasons were that the bank was not only not solvent, but that the methods of the bankers were unsafe, that Mr. Lunghino hadn't done exactly as I told him and as I told him and as soon as I told him, with regard to the segregating of deposits, that their securities were not only not of the value, but of the character that they should have; that the bankers had been, to use the vernacular, had been speculating substantially about securities, stocks and bonds, and at the time that I made this order they had pledged for loans about all the good securities that they had, and they had nothing left free and clear but their cash and substantially the real estate and what is sometimes called the cats and dogs of securities. "

Section 48 of the Banking Law vests the Superintendent of Banks with absolute discretion in the matter of granting or refusing the certificate asked for. That section provides as follows:

" § 48. Approval of Superintendent; filing. In any case in which this chapter makes the approval of the Superintendent a condition precedent to the doing of any act, it shall lie within his sound discretion to grant or refuse his approval. Such approval, if granted, shall be in writing and a copy thereof shall be filed in the office of the Superintendent. "

We are convinced that there was no abuse of discretion in refusing a certificate in this case.

Immediately upon such refusal the Superintendent took possession of the business of the delinquent bankers and undertook to liquidate the concern's affairs. Section 57 of the Banking Law, authorizing such action by the Superintendent, provides:

" § 57. When Superintendent may take possession of delinquent corporation, banker or personal loan broker. The Superintendent may forthwith take possession of the business and property of any corporation to which this chapter is applicable, or any individual banker or personal loan broker, or any private

banker to which article four of this chapter is applicable whenever it shall appear that such corporation or banker:

" 1. Has violated its charter or any law;

" 2. Is conducting its business in an unauthorized or unsafe manner;

" 3. Is in an unsound or unsafe condition to transact its business;

" 4. Cannot with safety and expediency continue business;

" 5. Has an impairment of its capital;

" 6. Has suspended payment of its obligations;

" 7. Has neglected or refused to comply with the terms of a duly issued order of the Superintendent;

" 8. Has refused, upon proper demand, to submit its records and affairs for inspection to an examiner of the Banking Department;

" 9. Has refused to be examined upon oath regarding its affairs."

Section 58 defines the course to be pursued by the Superintendent of Banks and under what circumstances his possession may be terminated, as follows:

" § 58. Circumstances under which possession of Superintendent may terminate. When the Superintendent shall have duly taken possession of such corporation, private or individual banker or personal loan broker, he may hold such possession until its affairs are finally liquidated by him, unless:

" 1. He shall have permitted such corporation or banker to resume business pursuant to the provisions of section sixty-one of this article;

" 2. The Superintendent shall have been directed by order of the Supreme Court to surrender such possession, pursuant to the provisions of section sixty of this article;

" 3. The stockholders of such corporation, at a meeting called by the Superintendent pursuant to the provisions of section seventy-nine of this article, shall have duly determined to appoint, and shall have appointed, an agent or agents to continue the liquidation of such corporation, and such agent or agents shall have qualified to take possession of its remaining assets as provided in section seventy-nine of this article;

" 4. The depositors and other creditors of such banker or

broker and the expenses of such liquidation shall have been paid in full."

Section 60 of the Banking Law defines the time and manner of judicially testing the action of the Superintendent, as follows:

"§ 60. Manner and time within which action of Superintendent in taking possession may be tested. At any time within ten days after the Superintendent has taken possession of the property and business of any such corporation, banker or broker, such corporation, banker or broker may apply to the Supreme Court, in the judicial district in which the principal office of such corporation, banker or broker is located, for an order requiring the Superintendent to show cause why he should not be enjoined from continuing such possession. The court may, upon good cause shown, direct the Superintendent to refrain from further proceedings and to surrender such possession."

Within ten days after the Superintendent of Banks had taken possession of the business of S. Lunghino & Sons, the firm made an application under section 60 to regain possession of the business and for an order of the Supreme Court directing the Superintendent to refrain from further proceedings and to surrender such possession. The Superintendent interposed an answer in justification of his course, and the matter came to a hearing at the Erie Special Term, and the learned trial court on April 3, 1915, granted the order appealed from. By the terms of the order the Superintendent of Banks is directed to refrain from further proceedings in respect to the liquidation of the property and assets of the firm, and that he surrender the possession of the business and property of the firm with all convenient speed, and upon compliance by said firm of S. Lunghino & Sons with the following conditions:

"First. That said firm of S. Lunghino & Sons shall add $15,000 in cash or good securities as additional capital to be employed by said firm henceforth in the business transacted by it as private bankers and that such additional capital be obtained without in any wise increasing the liabilities of said firm.

"Second. That all salaries to the members of said firm whether for services to the bank or to the Sterling Finance &

Realty Company, the stock of which is part of the capital of said bank, shall cease until the further order of the court and that any salaries received by any of the members of said firm for services rendered or to be rendered the Italian Courier, which is a newspaper largely owned by the firm, shall be immediately turned over to the firm and held as a part of its resources.

"*Third.* That the net receipts of the real estate owned by said firm collected by Joseph J. Lunghino since May 1st, 1914, which amounts to approximately $2,591.30, shall be paid over to the firm of S. Lunghino & Sons and retained as a part of its resources. (This real estate was formerly owned by Joseph J. Lunghino personally and contributed by him to the firm as a part of its capital in the month of April, 1914.)

"*Fourth.* That the agreement of April 14th, 1914, between the members of the firm relating to the contribution of additional capital to the firm by Joseph J. Lunghino, except as said agreement evidences such contribution, shall be cancelled and annulled and no part of such capital shall be withdrawn by any member of the firm.

"*Fifth.* That the said Joseph J. Lunghino shall give his individual attention to the business of said firm."

Said order concluded with the direction: "Before resuming business or receiving said property from the said respondent, the members of said firm shall file in the Erie County Clerk's office a statement signed by them accepting the terms and conditions hereof and agreeing to comply herewith and cancelling and annulling the agreement of April 14th, 1914, above referred to, except as said agreement evidences the contribution of additional capital by Joseph J. Lunghino to the firm; and the said Joseph J. Lunghino shall file in said Clerk's office an affidavit that he has faithfully complied with conditions first and third above named."

The sole question involved upon this appeal is as to the authority of the Supreme Court to assume jurisdiction and control over the affairs of the respondents and to nullify the action of the Superintendent of Banks as attempted by said order.

The learned court, at Special Term, passing upon the firm's

Fourth Department, January, 1917.          [Vol. 176.

application for repossession, delivered an opinion in which the court states that this banking firm is criticised, and justly, in several particulars, and that if it continued it would be obliged to overcome such criticisms. The court assumes in deciding the application to "follow the same lines as the Superintendent would in the first instance," and then suggests that the firm should add $15,000 to its capital in cash or good securities; that the net receipts of the bank's real estate, collected by Joseph J. Lunghino, should be turned over to the firm; that all salaries of members of the firm should cease until further order; that the individual attention of Joseph J. Lunghino should be given to the business, and that the provision in the partnership articles authorizing the withdrawal of capital must be considered of no effect, and any withdrawals by any member of the firm be absolutely prohibited. The order and conditions permitting repossession by the firm hereinbefore quoted follow such suggestions of the court.

The appellant contends that the order of the court was entirely unauthorized and that thereby the court assumed prerogatives with which the law did not invest it. We think the appellant is correct in such interpretation of the law. In the enactment of the Banking Law of the State the Legislature adopted a well-defined scheme with reference to private bankers to bring them directly under the control and supervision of the Superintendent of Banks. He was the officer invested by the Legislature to pass upon the character, responsibility and general fitness of the person seeking to engage in the business of private banking. The act (§ 48) provides that whenever the approval of the Superintendent is made a condition precedent to the doing of any act, it shall lie within his sound discretion to grant or refuse his approval. The Legislature having confided the decision of a matter of a public nature to a public official with discretionary power to act in the premises, acts properly within such discretion are not subject to judicial review at the instance of some one claiming that a different decision should have been made. (*Ontario Knitting Co.* v. *State,* 205 N. Y. 416.)

There can be no claim but that the Superintendent acted upon good cause in refusing to certify respondents. Indeed,

the court at Special Term expressly found that the business conduct of the firm was open to just criticism and expressly asserted that if they were to continue there must be radical changes in their business methods, and in imposing as conditions for reinvesting the firm with the business the court required reformation in the very particulars criticised by the Superintendent of Banks.

Section 60, it will be observed, only authorizes the court, "upon good cause shown," to direct the Superintendent to refrain from further proceedings toward liquidation of the bank's affairs, and to surrender possession of the property and business of the delinquent. In other words, if the Superintendent had good cause to assume possession of the business of this firm, then under section 60 it did not lie with the court to divest him of possession. The court here assumed to act with the same powers as those with which the Legislature expressly invested the Superintendent of Banks. Such, we conceive, was not within its power. The Legislature nowhere gave the Supreme Court supervision over private banks. The Banking Law confides such power in the Superintendent of Banks alone, and, in assuming to discharge the functions of that official in this case, we think the court exceeded its authority. Private bankers are only permitted to engage in business upon certification by the Superintendent, and if illegally conducted, the Legislature has marked a course to be pursued in order to end the bank's activities. It has reposed in its specially constituted State official the sole power to act, and it does not lie with the court to substitute itself for such legally constituted authority.

In 1908 the statute with reference to individual bankers was amended so as to invest the Superintendent of Banks with plenary power to take possession and liquidate the affairs of a bank and in reference to such amendment, in *Matter of Union Bank* (204 N. Y. 313), the Court of Appeals, Judge WERNER writing, says: "The events which led to its enactment are familiar history of which we may take judicial notice. The financial depression of 1907, and the resulting embarrassment of many banks, culminated in a series of receiverships in which the demands for commissions and counsel fees were so extrava-

gant as to arouse an instant popular demand for reform. To that end the superintendent of banks was by statute invested with the powers which had previously been exercised by receivers appointed by the courts."

In our opinion section 60 merely gives to the Supreme Court the right to review the action of the Superintendent of Banks in taking possession of the bank. If it was made to appear that he had acted arbitrarily and without good cause, or that there had been an abuse of discretion, the court, under that section, might have well found good cause shown for ordering a repossession of the bank in the firm of S. Lunghino & Sons. The position of the learned court and the conditions imposed by the order effectually negative any such suggestion. The court recognized that the Superintendent was justified in his position, and having coincided in the view of the Superintendent as to the firm's delinquencies, the court should not, we think, have interfered with the procedure which the Legislature provided in such cases.

It is urged by respondents that the bank is now solvent and abundantly able to meet every requirement of the State Banking Department, and that for that reason it should be permitted to continue under the order of the court. A motion has been made to dismiss this appeal upon the ground that the questions involved hereon are, by reason of the present affluent condition of the bank and its ability to more than meet its legal obligations, purely academic. We are unable to adopt this view. The fact that a period of unexampled prosperity and favorable business conditions has served to rehabilitate the affairs of this institution is, in our opinion, quite aside from the question as to whether at the time this order was made just cause was shown for overruling the action of the Superintendent of Banks. The course pursued by the respondents in carrying on their business in utter violation of law, thereby subjecting themselves to heavy penalties, and their attitude throughout, have not been such as to commend them to the indulgent consideration of the court. If the bank is as solvent as respondents contend, there is little likelihood that any depositor will suffer by a liquidation of its affairs, and in the event of a quite probable return of stringency in

business conditions, it may well.be to the benefit of the depositors that their savings be taken from those whose business methods have shown them to be unworthy of public confidence. In our opinion the Superintendent found far more serious cause of criticism in the reckless business methods of this firm than mere impairment of capital. The loose arrangement permitting one member of the firm to withdraw capital of the concern at any time without the consent of his partners; his continued appropriation of the firm's property and income from its real estate to his private use; the stock gambling operations with the savings of confiding depositors, and general loose business.methods with which this business was carried on, is all abhorrent to legitimate banking, and the Superintendent might well have found persons adopting such methods unworthy of public confidence, and that they should not be permitted to further prey upon a trusting public. The Banking Law furnishes ample authority in the Superintendent to· permit a resumption of business when conditions warrant. We think the Superintendent of Banks was fully justified in the course he undertook in this case, and that the learned court exceeded its authority in granting the order appealed from, and that the same should be reversed, and that possession of the respondents' bank be returned to the Superintendent for such action in the premises as he may deem expedient, in accordance with the statutes in such case made and provided.

All concurred, LAMBERT, J., in result, except KRUSE, P. J., who dissented and voted for dismissal in a memorandum.

KRUSE, P. J. (dissenting):

1. As to the power of the court I am of the opinion that not only has the court power to review the action of the Superintendent in originally taking over the bank but that it may in a proper case require the assets to be turned back, although the action of the Superintendent in taking over the bank may originally have been proper. Section 60 of the Banking Law (Consol. Laws, chap. 2; Laws of 1914, chap. 369) seems to give ample authority for so doing in a proper case.

The scandal which arose in connection with the winding up

of affairs of banks grew out of the exorbitant fees of receivers and counsel. The Legislature, therefore, imposed upon the Superintendent of Banks the duties theretofore exercised by receivers. While the question as to whether a bank shall be taken over or its assets turned back in the first instance is to be determined by the Superintendent of Banks, I think his action is nevertheless subject to review by the courts, although I agree that his action should not lightly be interfered with.

2. As to the propriety of making the order, in view of the changed conditions, the question is academic. It now appears by affidavits and papers submitted on the application to dismiss the appeal that for several years and since the order was made the bank has been permitted to continue in business. It is in better condition than it was when the order was made turning back the assets. There are new depositors, new creditors, and new rights have intervened. A reversal of the order upon the ground that it was made improvidently would likely result in harm to the creditors and perhaps ruin the bankers and accomplish nothing but harm. If in the judgment of the Superintendent the business has not been conducted properly or lawfully and the facts have been such as to justify that judgment, I know of no legal reason which would have prevented the Superintendent from taking action against the bankers. That, however, has not been done, but the business has been permitted to continue since the order was made, as already stated.

I think under the circumstances the appeal should be dismissed.

Motion to dismiss appeal denied. Order reversed, with ten dollars costs and disbursements, and application denied.