In the Matter of the PEOPLE OF THE STATE OF NEW YORK, by ALFRED J. BOHLINGER, as Superintendent of Insurance of the State of New York, Appellant-Respondent. INTERNATIONAL WORKERS ORDER, INC., Respondent-Appellant; HERMAN A. SELIGSON et al., for International Workers Order Policyholders Protective Committee, Interveners, Appellants-Respondents.

First Department, July 1, 1952.

*Paul W. Williams* of counsel (*James B. Henry, Jr.,* with him on the brief), for appellant-respondent.

*Raphael H. Weissman* of counsel (*Frank J. Donner* and *Arthur Kinoy* with him on the brief; *Raphael H. Weissman* and *Frank J. Donner,* attorneys), for respondent-appellant.

*Philip J. McCook* of counsel (*Samuel Nirenstein, Milton H. Friedman* and *Thomas Russell Jones,* attorneys), for interveners-appellants-respondents.

*Philip M. Kovitz,* attorney for National Lawyers Guild, New York City Chapter, *amicus curiæ.*

VAN VOORHIS, J. International Workers Order, Inc. (hereafter called IWO) was organized in 1930 as a domestic fraternal benefit society under what is now article XIV of the Insurance Law of New York State. As such, through the lodge system comprising sixteen nationality groups in this country, it is authorized " to conduct prescribed ritualistic ceremonies for the initiation of new members or to carry on other altruistic, educational, fraternal or recreational activities " (Insurance Law, § 451), it is to have " a representative form of government " and its activities are to be " carried on solely for the benefit of its members and of their beneficiaries " (§ 450). The kinds of insurance benefits authorized are prescribed by section 453. As of December 31, 1950, it had about $100,000,000 of life insurance in force, the average policy being $700, and assets of $6,670,747, more than 97% thereof in the form of cash and Government bonds. Its membership totaled 186,000 at the end of 1947, decreasing to 137,425 on March 31, 1951.

Ninety-five percent of its insurance coverage consists of what is known as annual renewable term life insurance. This means that the insured is covered for a single year upon payment of his premium for that year, in which event he has the right to be covered at a higher premium for the ensuing year. The annual premiums per $1,000 range from $10.08 at age twenty-five, to $860.28 at age ninety-five. At age sixty-five the premium

per $1,000 is $37.72, and $94.08 per $1,000 at age seventy-five. Various options may be taken, all operating upon the principle that the older an insured becomes the more his premium is graduated upward or the more his insurance coverage is graduated downward. This type of insurance, although not forbidden by the Insurance Law, is regarded unfavorably by the great majority of insurance companies; it has been tried extensively in the past and found wanting. It appeals to young men, until they discover that, unless they die in youth, the annually increasing premiums make the cost prohibitive when they are most likely to need the insurance and least able to pay for it. The good risks tend to drop out and the poorer risks to continue their coverage, which in the past has led to the eventual dissolution of companies majoring in that variety of insurance. For these reasons the reinsurance of these risks upon the same basis encounters obstacles. A Referee has been appointed, however, to ascertain what may be possible in that respect.

At present the actuarial solvency of IWO is not questioned. The determination of the Superintendent of Insurance that the business of IWO should be liquidated and its corporate existence dissolved under subdivisions (e) and (f) of section 511 and sections 513, 514 and 525 of the Insurance Law, is based on his conclusion that subdivisions (e) and (f) of section 511 have been violated in that IWO has been " found, after an examination, to be in such condition that its further transaction of business will be hazardous to its policyholders, or to its creditors, or to the public ", in the language of subdivision (e), and that it " has wilfully violated its charter or any law of the state " within the meaning of subdivision (f).

The record amply sustains the finding that IWO is operated as an arm of the Communist party and the U.S.S.R. This whole subject has been so thoroughly explored and extensively elaborated in the record, in the opinion at Special Term and in the briefs, that it is unnecessary to discuss it further here. The Superintendent of Insurance has been upheld by Special Term, and is upheld in this court by reason of the primary loyalty of the officers and directors of IWO to the U.S.S.R., with the consequence that at any crisis which may occur wherein the interests of the U.S.S.R., as its Government conceives them, conflict with those of the policyholders of IWO or of the United States of America or of the State of New York, the interests of the U.S.S.R. will be first served. This has nothing to do with freedom of speech or of opinion. Loyalty and ideological differences pertain to different things. If these men are going to

manage an insurance society chartered by New York State, and under its supervision, there must be no question that they will be faithful to their trust, if occasion demands, ahead of the interests or national policy of the U.S.S.R.

This reaches the main question on this appeal, which is whether the further transaction of insurance business by IWO would, in view of its existing status, be hazardous to its policy-holders or to its creditors or to the public. IWO and the inter-veners-appellants-respondents, contend that the facts that it had $6,670,747 in its treasury on December 31, 1950, and that it still is operating on a sound actuarial basis, demonstrate that the decision by Special Term in favor of the superintendent is erroneous.

This contention overlooks that moral risk enters into what constitutes financial hazard. A financial hazard often involves a moral component. In fact, all commercial credit is based upon what is sometimes derided as " bourgeois morality ". It has been argued that the superintendent's application should have been made under subdivision (n) of section 511 to change the management, instead of to terminate the corporation, if the officers or directors were found to be "dishonest or untrust-worthy ". The difficulty with that contention is that, although these officers and directors have not converted to their own use the insurance money of IWO, the conduct of that organization demonstrates that its management is so deeply involved in Soviet Russian communism that it matters little who are the particular officers or directors at any given moment. Its administration, in practice, has been, and inevitably will continue to be, the same as though under its charter there were a qualification that to be an officer or director one must be a communist. There is nothing which indicates, to be sure, that the officials of IWO would steal funds of the organization for their personal advantage; there is reason to believe, however, that, acting subject to the discipline of the Communist party and the Politburo in Soviet Russia, they would not hesitate to do so for the party under orders. From litigation in the courts, and from public knowledge of facts concerning which we are required to take judicial notice (*Nankivel* v. *Omsk All Russian Govt.* 237 N. Y. 150; *St. Nicholas Cathedral* v. *Kedroff,* 302 N. Y. 1, 23), it has become increasingly apparent that, when it is considered to be in the interest of communist organizations to make payment for obligations incurred in commercial transactions in the United States, the money is available to meet them, but that when it is thought otherwise, the necessary funds vanish and can be

located and attached only with the utmost difficulty (e. g., *Bardons & Oliver* v. *Amtorg Trading Corp.*, 275 App. Div. 748, 904; *Magnetic Eng. & Mfg. Co.* v. *Amtorg Trading Corp.*, 275 App. Div. 1034; *Miehle Print. Press & Mfg. Co.* v. *Amtorg Trading Corp.*, 275 App. Div. 748; *Ecco High Frequency Corp.* v. *Amtorg Trading Corp.*, 279 App. Div. 729). The circumstance that the Superintendent of Insurance refrained from acting earlier is not an indication that he should not have acted now, but rather that these proceedings were begun with deliberation, having been postponed until the accumulation of evidence of that kind has made this regrettable conclusion almost inevitable.

In this connection it should be noted that article XIV of the Insurance Law imposes different requirements for the incorporation of domestic as contrasted with '' foreign or alien '' fraternal benefit societies (§ 464). IWO was organized as a domestic society. If it had been incorporated among the foreign and alien societies authorized by section 464 as adopted in 1941, its license would not have been continuous, but would have expired annually on April 30th following the date of issuance. It is further provided by subdivision 6 of that section that '' No alien society shall be authorized to do business in this state unless it shall at all times maintain trusteed assets, a trusteed surplus and a deposit in the United States pursuant to the provisions of sections ninety-nine, ninety-six and one hundred four respectively. Such trusteed surplus shall be in an amount not less than four hundred fifty thousand dollars and shall be held in trust for the security of members in the United States admitted to the society on or after January first nineteen hundred forty. The term ' policyholders in the United States ' in sections ninety-six, ninety-nine and one hundred four shall be deemed, in the case of authorized alien fraternal benefit societies, to refer to members in the United States admitted to the society on and after January first, nineteen hundred forty.'' This provision was added by section 3 of chapter 581 of the Laws of 1941. The Insurance Department stated in a revision note, referring to all foreign fraternal societies: '' The provision as to admission of alien fraternal societies is new. As in the case of alien insurance companies, because of the remoteness of control over these organizations, they are required to maintain trusteed assets within the United States which shall be available for the payment of claims incurred therein.''

This requirement was designed to protect beneficiaries in the United States against the financial hazard that funds under alien control might be withdrawn from the country. IWO is

a domestic society in form, but in reality is a foreign society. Its assets are in cash and Government bonds. They could easily be removed. It cannot be denied that such a risk is present here.

The broad significance of what constitutes a moral hazard in financial affairs is illustrated by section 24 of the Banking Law, requiring the Superintendent of Banks, before issuing a certificate to do business, to investigate through '' the best sources of information at his command that the character, responsibility and general fitness of the person or persons named in such certificate are such as to command confidence ''. (Cf. *Matter of Lunghino & Sons,* 176 App. Div. 285, 300.)

In *Matter of National Surety Co.* (239 App. Div. 490, 495, affd 264 N. Y. 474 on authority of *Matter of People [Title & Mtge. Guar. Co. of Buffalo],* 264 N. Y. 69), this court quoted from the report of Governor Hughes to the Legislature, March 8, 1909, concerning the power of rehabilitation by the Superintendent of Insurance: '' Circumstances may make the exercise of such a power of the greatest importance to all parties in interest, even though the institution may be solvent ''.

In *People* v. *Bank of San Luis Obispo* (154 Cal. 194, 201) the Supreme Court of California said: '' It is true that the phrase ' unsafe  *  *  *  to continue to transact business ' as used in the act is broader than the term ' insolvent,' and that a finding that it is unsafe for a banking corporation to continue business does not necessarily mean that it is insolvent.''

Our Court of Appeals has said: '' It is complained that a company may thus be solvent, and yet its business may be arrested. That is undoubtedly so. The management, credit and condition of a life insurance company, although solvent, may be such that it might be injurious to the public interest to permit it to continue its business '' *(Matter of Attorney-General* v. *North America Life Ins. Co.,* 82 N. Y. 172, 184–185; see, also, *Matter of People [Second Russian Ins. Co.],* 243 N. Y. 524).

Another illustration of the recognized importance of moral hazard in business transactions is found in the condition frequently inserted in bills and notes, and in conditional contracts of sale, that the creditor has the option to mature the obligation if, without regard to solvency of the debtor, he shall '' deem himself to be insecure.''

In *Connecticut Fire Ins. Co.* v. *Manning* (160 F. 382, 385) it was said by the Circuit Court of Appeals, Eighth Circuit: '' The moral hazard is one of the main elements, if not the chief element, of an insurance risk, and it is never negligible. It is

always material to the risk." This statement was made concerning fire insurance, and referred to the pecuniary interest of the assured to permit the property to burn, but it is a further illustration that financial hazard, as commonly conceived, involves a moral component. That is a matter which the Supreme Court of the United States has said " must always influence the underwriter in taking or rejecting the risk, and in estimating the premium " (*Columbian Ins. Co.* v. *Lawrence,* 27 U. S. 25, 49). It should also influence the Superintendent of Insurance in determining what is financially hazardous for the policyholders.

Here, of course, the moral risk is bound up in the system of which the management of IWO is a part, rather than in something discerned as a weakness of individual character. If a domestic insurance society is operated by men who act under the philosophy that their identity is subordinated to and merged in a foreign State, the risk must be appraised in the light of the morality of the State in which they consider themselves to be merged. When that State, intent upon promoting world revolution, repudiates what its official theorists and spokesmen describe as "bourgeois morality ", which includes rejection of our commercial standards of conduct if in conflict with their national interest, the financial risk to persons whose money they handle is more than negligible.

In violation of subdivision (f) of section 511, IWO exceeded the powers conferred on it by its charter in that it has acted primarily as an arm of the Soviet Russian Communist State, which is not among the statutory purposes of a fraternal benefit society. (*People* v. *North Riv. Sugar Refining Co.,* 121 N. Y. 582.) It is clear that the activities of IWO are not being carried on solely for " the benefit of its members and of their beneficiaries " as required by section 450 of the Insurance Law.

While there may not be sufficient evidence to establish that particular individuals have violated section 2385 of title 18 of the United States Code (known as the Smith Act) or the corresponding sections 160 and 161 of the New York Penal Law forbidding criminal anarchy, as in *People* v. *Gitlow* (234 N. Y. 132, affd *sub nom. Gitlow* v. *New York,* 268 U. S. 652) or *United States* v. *Dennis* (183 F. 2d 201, affd. 341 U. S. 494) the primary purpose of IWO has been shown to be the furtherance of the overthrow of our Government by violence, referred to as the second type of revolution in the opinion in *Matter of Lithuanian Workers' Literature Soc.* (196 App. Div. 262) as contrasted with the advancement of a revolutionary political cause by peaceful

ideological means. *Matter of Lithuanian Workers' Literature Soc.* is authority for revocation of IWO's charter on these grounds also.

We have considered carefully the grounds urged for reversal, but find them to be without merit. The case of *Matter of Northwestern Nat. Ins. Co.* v. *Pink* (288 N. Y. 359) and similar cases cited by appellants respecting the powers of the Superintendent of Insurance are not in point.

The order appealed from as resettled, entered August 24, 1951, should be affirmed, with costs. The appeals from the order entered June 28, 1951, should be dismissed as academic.

PECK, P. J., DORE, COHN and HEFFERNAN, JJ., concur.

Order as resettled, entered August 24, 1951, unanimously affirmed, with costs. Appeals from the order entered June 28, 1951, unanimously dismissed as academic. Settle order on notice. [See *post,* p. 915.]