In the Matter of CASTLE HILL BEACH CLUB, INC., Petitioner, against WARD B. ARBURY et al., Constituting the New York State Commission Against Discrimination, Respondents.

Supreme Court, Special Term, Bronx County, June 24, 1955.

*Walter J. Hopkins* and *John T. Power* for petitioner.

*Henry Spitz* and *Solomon J. Heifetz* for respondents.

MARTIN M. FRANK, J. From the oral argument, it appears that this is the first cause under the Executive Law of the State (art. 15) involving discrimination in places of public accommodation to be brought into the courts of this State. (For convenience, Castle Hill Beach Club, Inc., the respondent before the commission, will be referred to as the " petitioner.")

Two applications are under consideration, one by the petitioner, moving to review and annul an order of the " State Commission Against Discrimination," the other by the commission, seeking to enforce its order dated December 28, 1954.

The petition of the Castle Hill Beach Club, Inc., submitted in support of its prayer for relief alleges in substance: (1) that it was deprived of a fair hearing; (2) that the evidence was insufficient to sustain the charge and to support the findings made; (3) that it is a " place of accommodation which is in its nature distinctly private " (Executive Law, § 292, subd. 9) and therefore not subject to a commission order; (4) that as a membership corporation it is not under the jurisdiction of and is immune from regulation by the commission.

The proceeding before the commission was initiated upon a complaint made by Mrs. Annetta Brown, a Negro lady, who charged that on Tuesday, March 31, 1953, when applying for a season locker at the premises operated by the petitioner, she was told that none was available, whereas a white lady making the same request at the same time was accepted and assigned a bathhouse.

Mrs. Brown's complaint was processed in accordance with the provisions of the Executive Law (§ 297) and the regulations adopted by the commission. Commissioner Caroline K. Simon was designated to make the investigation. Upon her finding that probable cause existed, efforts were made by '' conference, conciliation and persuasion '' to eliminate the alleged objectionable procedure. These failed.

Thereafter and beginning on December 14, 1953, hearings were held on eight separate days before Commissioners Arbury, Carter and Pinto, sitting in banc. All parties appeared by counsel and full opportunity to present evidence and cross-examine witnesses was extended. Although the commission is not bound by the '' strict rules of evidence prevailing in courts of law or equity '' (Executive Law, § 297), adherence to such rules was substantially observed. Proof not clearly admissible under the rules of evidence as applied in our courts was excluded.

After due consideration, a decision was rendered. Two Commissioners (Arbury, Carter) found that the petitioner was guilty of unlawful discriminatory practices in a place of public accommodation. One Commissioner (Pinto) dissented. A '' cease and desist '' order was issued, in which the petitioner was directed to comply with detailed provisions for the operation of its premises. Objection is made to the order *in toto*.

At the outset, it must be noted that the record overwhelmingly establishes that Mrs. Brown was excluded from the premises in question because of her color. The findings in that regard are supported not only by her testimony and that of the commission investigator, but by admissions made by the officers and representatives of the petitioner. It is significant, too, that no Negro has ever been permitted to use the facilities of this place in all the years of its existence. No corporate by-law or resolution specifically provides for the exclusion of Negroes. However, the course of conduct of the officers, directors, and permanent members through the several years of the petitioner's existence, justifies the commission's conclusion that the practice of excluding persons because of color was the act of the petitioner. The corporation cannot disavow a course of conduct or responsibility

for it because it was not authorized by formal resolution. (*Matter of People [International Workers Order*], 199 Misc. 941, affd. 280 App. Div. 517, affd. 305 N. Y. 258, certiorari denied, 346 U. S. 857; *People* v. *Hudson Val. Constr. Co.,* 217 N. Y. 172; *Movietime* v. *New York Tel. Co.,* 277 App. Div. 1057.)

It should be noted that the dissent of Commissioner Pinto was based, not upon a lack of proof with respect to the charge that Mrs. Brown was excluded from the premises because of her color, but solely upon the ground that the record fails to establish that the premises were being operated as '' a place of public accommodation.''

Preliminarily it was urged by the petitioner that, unlike the established law in article 78 proceedings concerning other quasi-judicial administrative agencies, this court may substitute its own findings for those of the commission, should it reach a different conclusion based upon the record. The petitioner is in error in that regard. The Court of Appeals (*Matter of Holland* v. *Edwards,* 307 N. Y. 38, 44), in a review of a proceeding before the State Commission Against Discrimination, held that: '' Judicial review of findings made by an administrative agency such as this commission is, of course, limited to the question whether findings are, upon the entire record, supported by evidence ' so substantial that from it an inference of the existence of the fact found may be drawn reasonably.' (*Matter of Stork Restaurant* v. *Boland,* 282 N. Y. 256, 273; see, also, *Matter of McCormack* v. *National City Bank,* 303 N. Y. 5, 9; *Matter of Humphrey* v. *State Ins. Fund,* 298 N. Y. 327, 332.) ''

Since the court holds that a full and fair hearing was accorded the petitioner and that the fact of its discriminatory practice was fully established, only two questions remain: first, are the premises occupied by the petitioner a place of public accommodation; second, does the fact that petitioner was organized as a membership corporation exempt it from the provisions of the Civil Rights and Executive Laws?

The premises in question are 16 acres in size. There are 3,780 bathhouses, 2 swimming pools each 200 feet long and 75 feet wide, and a children's swimming pool one acre in area. There are 32 one-wall handball courts, 4 four-wall handball courts, and a basketball court; all of these have stands for spectators. In addition, 10 wall tennis courts, 6 softball courts and 12 ping-pong tables are provided. A section is set aside for beach chairs. A covered picnic area with tables, a large grass-covered lounge space, and a number of sand lots for use by children are included. The premises are equipped with hot and cold showers, and a

first-aid station with at least one nurse in attendance. The cafeteria accommodates 300 people. There are 2 soda fountains, and a bar 40 feet long where beer and soft drinks are dispensed. Two parking lots are operated in conjunction with the premises.

The petitioner does not dispute that 13,000 holders of seasonal cards can be accommodated. It asserts that this total includes 5,500 children. Furthermore, 10,000 people are admitted annually as guests of the regular patrons.

The foregoing description amply demonstrates that there are provided not one but many of the facilities included in the definition of " A place of public accommodation, resort or amusement " (Civil Rights Law, § 40) against which the State Commission is given the authority to take action in a proper case.

The record discloses that from 1928 through 1950, Castle Hill Estate, Inc., a stock corporation, owned the premises which it operated as a commercial enterprise and as a place of public accommodation, resort and amusement. Concededly, it was not at that time a place of accommodation in its nature strictly private.

From 1928 through 1945, Sayers Brothers were the attorneys for the above-named corporation. During the years 1945 through 1951, William L. Sayers and members of his family owned all the stock of Castle Hill Estate, Inc. and were the controlling officers and directors of the corporation. In 1951, Bronx-City Island Realty Corporation, a new stock corporation, was organized and the title to the property transferred to it by Castle Hill Estate, Inc., with the same group retaining ownership and control. It was admitted, " they own everything — lock, stock and barrel ".

On or about September 28, 1950, a certificate of incorporation for a membership corporation (the petitioner) was prepared by the office of William L. Sayers and submitted to the Supreme Court for approval. About a month later, a lease was executed by the Castle Hill Estate, Inc. (completely controlled by the Sayers family) as landlord, with petitioner as tenant. It provided for alternative methods of rental payments at the option of the landlord. Pursuant to its terms, the landlord received as rent the full amount of the petitioner's receipts less operating expenses and taxes. The landlord had the right to approve all checks, drafts or other orders drawn on the funds of Castle Hill Beach Club, Inc. on deposit with any bank. To effectuate this, two of four authorized signatures were required. Of the four persons permitted to sign checks, three were officers and directors of the landlord corporation. The fourth, the president of

the petitioner, was an employee of the landlord when it operated the premises. The bank account of the membership corporation was opened with funds provided by the landlord from advance deposits for lockers paid to it when it was concededly operating the premises as a commercial enterprise. The consent of the persons whose funds were so transferred was never obtained.

Although at least 7,500 adults are classified as members of Castle Hill Beach Club, Inc., the by-laws prepared in the office of Sayers Brothers, confine voting rights solely to permanent members, of whom there have been only six, consisting of the five incorporators and the man who managed the cafeteria. They have been in control from the time of incorporation to the initiation of the proceedings.

John J. Hickey, a member of the Bar associated with Sayers Brothers, and an incorporator and director, testified that he never saw the by-laws. No meeting was ever called to approve them or to elect directors. No vote was ever taken on management or financial policies. He never paid any dues and no annual directors' or treasurer's reports were ever furnished him. Frank G. Wilson, another incorporator and director, testified to the same effect. From this proof, the commission had the right to conclude that the same situation existed with respect to the other directors.

None of the so-called seasonal members have the right to vote and in fact do not; none have the right to receive notices of meetings and in fact none do. They have never had a voice in selecting permanent members, directors or officers of the petitioner. They never approved the by-laws. Their membership is automatically terminated at the end of the season. No financial or other reports were ever submitted to them. All the incorporators, directors and permanent members, whose control of the petitioner was absolute, were either officers, directors or employees of Castle Hill Estate, Inc., or employees or associates of Sayers Brothers.

That the same persons continued to operate the premises in the same manner, after the petitioner membership corporation was created, is amply supported by the record. Until 1953, there was no application for a change in the type of commercial liquor license originally issued by the State Liquor Authority to the stock corporation, although it required a higher fee than a license for a private club which restricts the sale of malt beverages to members and their guests. The membership corporation continued to apply for and receive the same kind of bathing establishment license from the New York City department of

licenses as had been issued previously to the stock corporation. No such license is required for a private club (Administrative Code of City of New York, ch. 32, tit. B, art. 27). Both before and after the organization of the membership corporation, the premises were listed in the classified telephone directories under the heading, " Bathing Beach — Public," and not under the heading of " Clubs ").

Most of the proof before the commission with respect to admission and membership taxes was excluded and will not therefore be considered. However, there is testimony to indicate that an effort was made to gain approval for a change from the admission tax collected by the petitioner as a commercial amusement enterprise to a membership club tax. The latter, because of allowable exemptions, would have resulted in a substantial tax saving. The attempt to make the change was not successful.

The petitioner's president, Mr. Biersdorfer, received a salary of $9,000 per year. The other officers were paid $7,500 annually. The record is devoid of proof as to the manner or method by which these salaries were arranged. Certainly, if this were a nonprofit membership corporation operated for the benefit of its membership, some corporate resolution or the minutes of a directors' meeting fixing or approving this compensation for these officers and directors would have been made a part of the record. The absence of this proof justified the assumption of its nonexistence.

Although the gross income of petitioner has averaged about $360,000 per year since its inception and the payroll for officers and employees only about $75,000, the petitioner has no profit balance. All of its funds remaining after the payment of taxes and personal services go to the landlord.

In the face of this evidence, the petitioner contends that it is a legitimate membership corporation. It asserts that the commission and the courts have neither the right nor the power to go behind the Supreme Court approval of its certificate, to ascertain whether the owners and operators of the premises conduct a commercial establishment and a place of public accommodation under the cloak of a membership corporation.

At the time the petitioner's certificate was submitted to this court for approval, the incorporators did not disclose that Negroes would be excluded from membership. Had that fact been made known, it is reasonable to assume that the application for approval would have been denied. The Supreme Court has held that " Organizations for the purpose of perpetuating the division of the people into racial groups  *  *  *  should

not be sanctioned." (*Matter of Catalonian Nationalist Club of N. Y.,* 112 Misc. 207, 208; cf. *Matter of General Von Steuben Bund,* 159 Misc. 231.) Nor would there be approval if the membership corporation were being used as a " cloak of respectability " to conceal " racial intolerance " (*Matter of German & Austrian-Hungarian War Veterans Post No. 65 of Glendale, Queens,* 13 N. Y. S. 2d 207).

Judge FULD, writing for the Court of Appeals (*Matter of Holland* v. *Edwards, supra,* p. 45), observed: " One intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive — for we deal with an area in which ' subtleties of conduct  *  *  *  play no small part '. (Cf. *Labor Bd.* v. *Express Pub. Co.,* 312 U. S. 426, 437.) "

Although the precise question was not involved in *Matter of Holland* v. *Edwards* (307 N. Y. 38, *supra*), we believe that the quotation justifies our conclusion that the commission has the power and the duty, as have the courts, to lift the corporate veil to ascertain the facts with respect to the *bona fides* of the petitioner. Equity frequently disregards corporate entities even when the subsidiaries are not mere instrumentalities of the parent (*Rapid Tr. Subway Constr. Co.* v. *City of New York,* 259 N. Y. 472, 491; *Berkey* v. *Third Ave. Ry. Co.,* 244 N. Y. 84, 95; *Blaustein* v. *Pan American Petroleum & Transp. Co.,* 293 N. Y. 281, 305).

If the petitioner is correct, then the Civil Rights Law and the Executive Law creating the commission could be rendered completely ineffectual by any individual or group using the guise of a membership corporation. It would result in emasculation of the statutes involved and substitute for substance the fetish for form.

In effect, the commission found that the real parties in interest employed the device of a membership corporation " to facilitate the exclusion of negroes " and thus continue a discriminatory practice in one of the largest places of public accommodation of its kind in the city of New York. The record amply justifies the conclusion that the petitioner has never been a bona fide membership corporation. It has not functioned for the benefit of its members, whether 6 or 13,000 in number, but only to serve the interests and under the exclusive control of the landlord corporation and through it for the financial advantage of its stockholders.

The overt and even blatant discriminatory practices of the past have succumbed, in recent years, to the condemnation of

an aroused and enlightened public and to the enactment of remedial legislation. However, those determined to continue such intolerant and intolerable purposes have attempted to evade the charge of discrimination by changing their methods of operation. The variety of stratagems employed seems infinite, and the ruses and dodges are limited only by the extent of the practitioners' ingenuity.

No one can reasonably believe that deep-rooted prejudices can be legislated into oblivion or that they are susceptible of cure by law alone, but there can be no doubt that effective legal procedures coupled with educational processes will narrow the areas where bigoted practices exist and bring the high concepts of democracy nearer to fulfillment.

The court determines that all the findings of the commission are supported by substantial proof.

The motion of Castle Hill Beach Club, Inc. is denied. The cross petition of the New York State Commission against Discrimination is granted. Settle order.