In the Matter of the PEOPLE OF THE STATE OF NEW YORK, by ALFRED J. BOHLINGER, as Superintendent of Insurance of the State of New York, Petitioner.

INTERNATIONAL WORKERS ORDER, INC., Respondent; HERMAN A. SELIGSON et al., for the International Workers Order Policyholders Protective Committee, Interveners.

Supreme Court, Special Term, New York County, June 25, 1951.

*Nathaniel L. Goldstein, Attorney-General (Paul W. Williams* of counsel), and *James B. Henry, Jr.,* for petitioner.

*Raphael H. Weissman, Frank Donner* and *Arthur Kinoy* for respondent.

*Milton H. Friedman* and *Thomas Russell Jones* for interveners.

GREENBERG, J. The Superintendent of Insurance of the State of New York on December 18, 1950, applied to this court for an order to show cause which would direct him to liquidate the business and dissolve the corporate existence of the International Workers Order, Inc., a corporation organized as a fraternal benefit society under the Insurance Law of the State of New York and transacting business under article XIV of that law. The petition upon which the application was based recited (1) that the International Workers Order (hereinafter referred to as I. W. O.) had been found, after an examination, to be in such condition that its further transaction of business would be hazardous to its policyholders, to its creditors, and to the public (Insurance Law, § 511, par. [e]; § 513), and (2) that it has willfully violated its charter and various laws of the State (Insurance Law, § 511, par. [f]; §§ 513, 525).

More specifically, the petition alleged that the I. W. O. was and is dominated by the Communist party and that it has been responsive, as demonstrated by its manifold activities, over a period of twenty years, to the revolutionary aims of the Communist party both abroad and in this country. These conclusions and others of the petition were predicated upon (a) an examination into the affairs of the corporation conducted by an examiner of the Insurance Department duly appointed in 1946 and again in 1948 by the Superintendent of Insurance pursuant to section 29 of the Insurance Law; (b) upon the report and recommendations of the examiner who found that the I. W. O. was not simply a fraternal benefit society as it was required to be by its charter and its stated purposes but in fact an agency of the Communist party of the United States which disseminated its doctrines through the instrumentality of the various subordinate lodges of the I. W. O. and through the agency of the governing body, its officers, and executive committee; that the activities of the I. W. O. constituted a hazard as defined in the Insurance Law and also that they were in direct conflict with its charter, its stated purposes, and the laws of the State; (c) upon the hearing upon this report held before a deputy superintendent in which the respondent

participated during a period of four days and although afforded full opportunity did not introduce any evidence to controvert any material fact in the report, and (d) upon the decision rendered by the said deputy superintendent who sustained the conclusions of the report but modified it by eliminating therefrom certain material. The opinion and findings were approved by the Acting Superintendent of Insurance.

The petition and the exhibits attached thereto were carefully considered by the court. Since the matter contained in the report, under section 30 of the Insurance Law " shall be admissible in evidence and shall be presumptive evidence of the facts stated there," the court signed the order which required the I. W. O. to show cause why it should not be dissolved and why it should not be restrained pending the ultimate determination of the issues from the transaction of new business and from the transaction of its current business except under the joint supervision of the superintendent. The restraining order, which is still in effect, was sought on two separate occasions to be vacated, at least to the extent of permitting the I. W. O. to hold its convention. The court was strongly of the opinion that both in the interest of orderly procedure and to preserve the *status quo* the relief sought should not be granted. From this disposition the I. W. O. was offered an opportunity to appeal to the Appellate Division but it declined to pursue that course.

The hearing on this petition in this court covered most of a period of eleven weeks. Forty-six witnesses were called, examined and cross-examined, and the affidavits of 113 members of the I. W. O. were received in evidence with full force and effect and as though the affiants had personally appeared and testified. Three hundred and fifty exhibits embracing books, magazines, articles, speeches and other pertinent material were introduced and received in evidence. In addition to the attorneys for the I. W. O. the court permitted the attorneys for a policyholders' committee to appear and to examine and cross-examine witnesses. The record of this hearing fills approximately 5,200 pages.

At the end of the petitioner's case, the respondent requested and received ten days' time within which further to prepare a defense in the light of the petitioner's evidence. At the conclusion of the hearing both sides were allowed six weeks' time to prepare briefs and an additional ten days' time for the submission of reply briefs. A group of some 200 persons said to be members of the I. W. O. throughout the United States

representing various walks of life was permitted to submit a brief *amicus curiæ.* Thus all parties have been allowed great latitude in preparing their cases, presenting their evidence and arguing the questions raised by this proceeding.

In the light of contemporary political conditions, the existence of any element relating to communism or the Communist party tends to fill the atmosphere with emotionally charged feelings engendered by the controversy which now rages around this subject. It therefore places a special burden on the court to remove itself from the prejudice of the venue, to scorn the infection from the ill tempered and to abjure the passion and political currents of the general controversy and to confine itself to an objective analysis of the factual and legal issues in the case before it. The site is indeed a delicate one on which to balance but neutrality nevertheless must be observed if justice is to prevail. This does not mean that the court should be so removed to be unrealistic nor so close to be intimidated.

Recognizing the dangers inherent in this proceeding and the seriousness of the consequences to both parties, it was the threshold purpose of the court carried out to the very end of the hearing, to afford the widest margin of protection to the respondent by the most scrupulous observance of due process. Inroad on this resolution was perhaps unconsciously attempted at the very beginning of the hearing when the petitioner sought to impress upon the court the importance of the listing by the Attorney General of the United States of the I. W. O. as a subversive organization. This effort fell upon deaf ears. The court felt that it was unthinkable and shocking to its conscience to permit this ex parte judgment of the Attorney General to condemn an organization without giving it notice of the action contemplated and a hearing on the charges that gave birth to the listing by the Attorney General. The action of the Attorney General was not due process according to the law of the land and the court refused to consider this listing as having any bearing upon the determination of the important issues involved in this litigation.

Before the conclusion of the hearing the Supreme Court of the United States in *International Workers Order* v. *McGrath* (182 F. 2d 368, revd. *sub nom. Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123) sustained this view and ruled that the respondent was entitled to a hearing before judgment was passed on it, a ruling which was based in this court's judgment on elementary principles of law, on the provisions of the Constitution and the very concept of our democracy.

The I. W. O. was incorporated in New York in 1930 as a fraternal benefit society under article XIV of the Insurance Law. Its purposes, as stated in the certificate of incorporation, are in part: " SECOND: * * * (a) to promote fraternal intercourse among the members; to assist its members in cases of sickness or disability * * * to carry on altruistic, educational, fraternal and recreational activities for the benefit of its members; to further benevolence and to allay poverty amongst those that are dependent upon its members * * * by establishing a sick fund and also a beneficiary fund, from which, upon the death of any member in good standing, the beneficiary named in the membership certificate or policy issued to the deceased member shall draw an amount not exceeding the sum designated therein ". The I. W. O.'s principal office is in New York City. It is comprised of about 1,600 individual lodges, many of which are grouped in the national language societies which form unincorporated subdivisions of the I. W. O. These lodges are located throughout the United States. The I. W. O. is licensed in seventeen other States and the District of Columbia. In December, 1949, it had a membership of about 162,000 and over $6,000,000 in assets. These assets included over $500,000 in cash and investments in government bonds amounting to more than $5,000,000. The organization writes life, accident and health insurance. It had in force on December 31, 1949, insurance amounting to more than $110,000,000 and had paid out up to that time more than $13,000,000 in benefits. It is concededly solvent and in a sound financial condition at this time.

The Superintendent of Insurance charges that the I. W. O. is, and has functioned as a political organization, directed and controlled by the Communist party; that it has used its insurance program as a means of attracting members for the purpose of awakening and directing their political views and activities along prescribed communist lines; that its program has included developing the class consciousness of members, their sympathy and admiration for the U. S. S. R. and its form of government, stimulating the active participation in the class struggle in this country through the I. W. O., and organizations of kindred purposes, and wherever possible, converting these members to full membership in the Communist party.

Accordingly the superintendent contends that the I. W. O. should be liquidated because (1) its political control, objectives and operations create a financial hazard, real and potential, within the meaning of paragraph (e) of section 511 and section 513 of the Insurance Law; (2) it has by its political nature

and activities violated its charter and its expressed purposes in the articles of incorporation; (3) it has perpetrated a fraud upon the State of New York upon its very creation in that its primary purpose was not the organization of a fraternal benefit insurance society but in fact the establishment of an agency of or a front for the Communist party of the United States, and (4) it has violated the laws of the State against political contributions by corporations (Penal Law, § 671), the Smith Act (U. S. Code, tit. 18, § 2385), and the Criminal Anarchy Act (Penal Law, §§ 160, 161).

The evidence presented by the superintendent overwhelmingly establishes the basic political nature, purposes and activities of the I. W. O. The most persuasive of this evidence is contained in the official publications of the organization and the writings and speeches of most of its officers which comprise the 174 exhibits offered by the superintendent. These records written by I. W. O. officials — the majority of the national officers and members of the executive committee — and issued by the I. W. O. have a high probative value since their credibility is not open to challenge on the ground of personal or ideological bias or financial interest as may be ascribed generally to the testimony of witnesses. These records are supported and amplified by the testimony of a number of former officials and members of the organization, who were also former members and officers of the Communist party of the United States. The detailed picture presented by this mass of evidence may be delineated by reference to only some of the documents and a small part of the testimony.

In 1935 the I. W. O. issued a bound publication, "5 Years I.W.O.," which is a report on the origin, purposes, activities and future program of the organization. This publication and the I. W. O. manifesto reprinted therein state that the I. W. O. was formed by a revolutionary left-wing group which left the Workmen's Circle, another fraternal benefit society, after a bitter internal struggle. The stated reasons for leaving were that the Workmen's Circle had given up its political aims and had become a " bourgeois " fraternal organization; that it had abandoned its revolutionary program by eliminating therefrom the abolition of the capitalistic order, by abandoning its program to develop the class consciousness of its members and to stimulate their participation in the class struggle and by taking an unsympathetic attitude toward the Soviet Union, " the only proletarian state in the world," as well as toward the revolutionary proletarian party of America, the Workers Party, and its organ, *The Freiheit*.

Rubin Saltzman, first general secretary of the I. W. O. and currently its national vice-president, in an article entitled "First Struggles for Proletarian Order" writes as follows:

"The protest convention [this referred to the left-wing protest convention held for the purpose of condemning the Workmen's Circle's convention at Toronto, Canada, at which resolutions were passed condemning the Soviet Union and the Workers Party] was the beginning of a broad left mass movement in the Workmen's Circle. The left wing came out of the convention strengthened and united with a clear class struggle program. For the delegates of the convention the problem was now clear. The program of the protest convention had to be brought to the membership of the Workmen's Circle. The necessity for the organization of an apparatus [apparatus is a familiar communist word] was clearly understood. * * *

"The resolutions against the Soviet Union and against a Workers Party and its Jewish organ, 'The Freiheit,' betrayed the principles of our organization. They revealed the aim of driving out of the ranks of the organization [Workmen's Circle] the revolutionary and ideologically consistent section of the members."

The Workers party later became the Communist party of the United States, as Saltzman testified during the hearing. Saltzman also related in his article the conflict between this left-wing group and the "reactionary leadership" of the Workmen's Circle from 1922 to the conference of the left-wing branch in 1929 at which decision to withdraw from the Workmen's Circle was made and the conference of March 30, 1930, at which the International Workers Order was formed. The I. W. O. was therefore founded, as is stated and restated proudly, as a revolutionary proletarian fraternal organization to serve as an instrument to further the class struggle and the Communist party here and abroad.

The officers of I. W. O. and its leaders clearly stated in their articles in "5 Years I.W.O." the role that the I. W. O. was taking as part of an over-all political program which is unmistakably that of the Communist party. In fact, in another article entitled "Class Struggle in Fraternal Organization — Text of Declaration Adopted at Conference of Left-Wing Progressive Branches of the Workmen's Circle and Independent Workmen's Circle March 30, 1930" the program of the I. W. O. was set forth as follows: "The order recognizes that, having a specific task, it nevertheless supports with its means and membership the struggles of all the economic and political organizations of the working class that follow the line of the class struggle

among those organizations, the Communist Party occupies the first place in the political field and the Trade Union Unity League in the economic field. The order also recognizes the importance of the work conducted by such auxiliary organizations as the International Labor Defense and the Workers International Relief which help the victims of the class struggle."

Still further, in another article published by the national executive committee in 1930 entitled " A New Worker's Stronghold " it is written: " We are primarily a fraternal organization. But we cannot close our eyes to the political field, we view all parties active in that field. We find that the Communist Party is the only party that fights for the workers' interests. We therefore endorse the Communist Party. We appeal to all workers to vote for the Communist Party. We aid the party in its struggles. At the same time, however, we remain a non-party organization."

This language from the responsible officials and writings of the I. W. O. itself clearly outlines the future course that the I. W. O. was to take, and sets forth in unmistakable language the program it was to follow and the dominant factor in that program. These declarations made at the very inauguration of the I. W. O. are completely at war with the fervent and repeated protestations on the part of the officers of the I. W. O. during the course of the hearing that it had its genesis in communist principles or that it was established as a revolutionary working arm of the Communist party and for the purpose of spreading communist doctrines and ideologies.

The I. W. O. was to establish a system of mutual benefits, one whose high calibre of service and minimum cost would serve to advertise the advantages of proletarian quality. The next step was to develop the political thinking and action of the members along prescribed lines. Briefly, according to " 5 Years I.W.O.," workers were to be made class conscious; they were to be schooled to recognize and fight against the forces that made for their insecurity: the absence of social insurance, unsanitary and unsafe working and living conditions and the capitalists who maintained these conditions. They were to be taught that workers and bosses are irreconcilable enemies and can have no common interests.

While the I. W. O. was intended by its charter and express purpose to conduct its activities primarily in the sector related to mutual benefit associations, it was to mature its members politically and introduce them to other groups which carried out aspects of the same political program in other fields, groups

such as labor unions, political parties, workers' defense organizations and the so-called *Workers Press,* and it was to teach its members to " make themselves active parts of the fighting organizations of the working class on the economic and political battlefield of the class struggle." These are not merely the views of isolated contributors to the publication but are the common theme of the entire publication written by leading I. W. O. officials and issued by that organization.

These articles also provide some details as to how the program was carried out. An article on the establishment of a literature department refers to the I. W. O. as " a school which teaches the members the causes of their economic insecurity which inspires them to fight against these causes and which shows them the road for their removal." The article goes on to point out that since lectures and discussions can only outline problems, it is necessary to " build an apparatus for the distribution of such literature relating to current questions, agitational mass literature as well as educational literature of a large volume."

There is evidence that this educational campaign was actively extended to young groups and even to the junior section. The article, " Fraternalism and Workers' Children," stresses the importance of counteracting bourgeois educational matter injected into children. " The children's groups of the I. W. O.," this article reports, " represent a collective effort of our organization to help the individual parent members to solve the problem of developing their children into conscious members of the working class."

The article, " Our I. W. O. Youth Section," reports progress in the development of educational activity through lectures, symposiums, forums and classes as media for developing the class consciousness of youth membership and the establishing of two full-time training schools for organizational training in the work of the youth and children's section.

This publication also contains an article entitled " Our Workers' Press," which stresses the great services rendered to the I. W. O. by the *Daily Worker, The Morning Freiheit,* the Hungarian *UjElore,* the Slovak *Rovnost Ludu,* and a number of other foreign language publications. The article emphasizes the reciprocal duty of the I. W. O. and its members to do more than contribute to the workers press, namely, to read it themselves and make themselves " an active force in the building of its circulation." The methods of effectuating this objective are indicated in the report on the youth section by Dave Greene

which, after stating that the question was raised of whether the *Young Worker,* published by the Young Communist League, should be sold and distributed by the youth branches, reports "it took quite a while before we were able to convince the existing branches that the *Young Worker* was their paper, that it was leading the fight of the working and student youth, and as such is entitled to the support of the membership of the Youth Section of the I. W. O."

The reports of the nationality groups include reference to such activities as participation in strikes, support of other sections of the revolutionary movement, mass propaganda and development of class consciousness. The youth group reported increased participation of its members in the historic struggle of the workers, including May Day celebrations, picket lines, boycott of the Olympics in Los Angeles and in organizations such as the American League Against War and Fascism. The youth group also reported that a delegate was sent as part of the I. W. O. delegation to the U. S. S. R. and on his return toured youth branches in the United States, familiarizing them with the work of building socialism in the U. S. S. R. and mobilizing them for the defense of the U. S. S. R. Even the junior section reported that it had carried out a policy of involving its junior branches in every possible action or campaign of the workers in their struggle against the class enemy. The juniors, it is proudly reported, participated in May Day demonstrations, election campaigns for workers' candidates, struggles against evictions, picket lines, collection of relief and other strike activities.

The summary contained in this one publication, "5 Years I. W. O.," is amplified by the mass of detailed evidence of the daily activities of the I. W. O. in carrying out this program. The language after 1935 is somewhat more guarded than in the earlier publications. However, the program and the nature of the activities appear to be the same. Some of its chief activities as established by the evidence are:

Support and participation in political campaigns of the Communist party;

Support of the *Daily Worker* and the *Workers Press;*

Serving as a spawning and recruiting ground for members of the Communist party;

Participation in the campaign to raise money for the eleven indicted communist leaders;

Dissemination of communist literature, political and economic theory and current news interpreted in line with communist doctrine and ideology;

Development of admiration and sympathy for the U. S. S. R. and encouragement of antipathy toward every program undertaken by the Government of the United States which was not wholly and completely in accord with the policies and programs of the U. S. S. R., and

Participation in causes and campaigns for civil rights, labor rights, peace, war effort, disarmament, etc., espoused by the Communist party.

*Support and participation in political campaigns of the Communist party.* This is the most obvious political activity of the I. W. O. in behalf of the Communist party. In 1930, the support is evidenced by an I. W. O. pamphlet, *A New Workers Stronghold,* which states that while the I. W. O. is primarily a fraternal organization, it cannot close its eyes to the political field and it then appeals to all workers to vote for the Communist party as the only party that fights for the workers' interest. In 1932 the campaign committee of the I. W. O. issued pamphlets indorsing the Communist party platform and urging every member of the I. W. O. to rally behind the platform and candidates of the Communist party. This pamphlet represents the Communist party as the only party struggling for the workers, as a party which does not rely on the vote and parliamentary action to achieve its aims, as a party standing foursquare back of the Soviet Union and working to organize and lead the workers in a manner that would bring about the workers' rule.

In the 1936 election campaign there was a National Communist Campaign Committee for the I. W. O. which issued an outline for speakers prepared by David Greene. This urged support of Earl Browder for President and James W. Ford for Vice-President. It also reported that the committee was appealing to the I. W. O. to contribute to a $50,000 People's Chest. This committee, described in the *New Order* of September, 1936, as " independent " of the I. W. O., was headed by leading I. W. O. officials, Rubin Saltzman as campaign manager and Max Bedacht as treasurer. The appeal was issued through the official publication of the I. W. O. and the coupon booklets for this drive were distributed through the I. W. O. branches. The claim of " independence " is thus not supported by the evidence. The *New Order* also carried campaign material in support of communist candidates. Among these communist candidates were two top ranking I. W. O. officials, Max Bedacht and George Powers.

In January, 1944, the organization publication, the *Fraternal Outlook,* reported that the I. W. O. had supported the com-

munist candidates in the November, 1943, elections for the New York City Council. In December, 1945, the same publication reported a campaign rally for Councilman Davis, organized by the I. W. O. Lodge 691 in Harlem and addressed by I. W. O. official David Greene. In addition, there is evidence as to other ties between the local lodges of the I. W. O. and the Communist party and contributions in election by these local lodges in support of Communist party candidates.

*Support of the Daily Worker and the Workers Press.* The principle of actively supporting and helping to build the circulation of the *Daily Worker* and the *Workers Press,* expressed in " 5 Years I. W. O.", from the evidence, continued to be a working principle. The I. W. O. official publications pictured the *Daily Worker* as the only truthful newspaper and as a paper fighting for the I. W. O. Members were repeatedly reminded of their reciprocal duty to support and work for the *Daily Worker,* particularly in helping to increase the circulation of the paper. The evidence establishes that this paper was sold at many of the I. W. O. lodges. The *Daily Worker,* in addition, received substantial revenue from the I. W. O. During the three years from 1944 to 1946 over $30,000 was paid to the *Daily Worker* and over $35,000 to *The Freiheit,* in addition to smaller sums paid to other newspapers. While the payments to the *Daily Worker* and *The Morning Freiheit* were for " advertising " there is evidence that they also had as a primary objective the financial support of these newspapers. There is evidence also in the *New Order* of 1937 of an appeal by I. W. O. leaders to the membership to raise funds for the *Daily Worker* and of fund raising for this publication by I. W. O. lodges.

*Serving as a spawning and recruiting ground for members of the Communist party.* The early publication records the I. W. O. objective of developing the political thinking of members and stimulating them to join other organizations taking part in the class struggle program, including the Communist party itself. The method was simple. If the person was class-conscious, he was asked to join the Communist party; if he was semi-class-conscious, he was asked to join the I. W. O. or some other front organization. While the complete story as to this activity is necessarily unavailable in the record, the partial success is at least indicated by David Greene, in his speech to the tenth convention of the Communist party of New York State in 1938. In this speech he reports that the party members of the I. W. O. contributed several hundred members in the previous party-building campaign and pledged to become

"more bold" and "build the Party much faster in the future than in the past."

*Participation in the campaign to raise money for the eleven convicted communist leaders.* More recently, in 1948 and 1949, the I. W. O. has actively campaigned to raise money for the eleven indicted and now convicted communist leaders. The records of the national organization show that it collected and transmitted a minimum of $18,000 in cash to the Civil Rights Congress for this purpose. This campaign was carried on through the official publication of the I. W. O. The trial of the communists was characterized as a witch hunt and likened to the Reichstag fire trials of Hitler and the members were urged, in addition to contributing, to participate in a mail campaign against the indictments and to obtain further information on fighting the indictments.

*Dissemination of communist literature, etc.* Great emphasis was laid by the I. W. O. on the distribution of communist literature. Communist periodicals, pamphlets, and tracts were sold in the lodges and the witnesses testified that distribution of party literature was one of the functions in relation to the I. W. O. which was impressed upon them as being most important. The I. W. O. publications also emphasized literature. In addition to the publications of the Communist party proper, the I. W. O. distributed revolutionary literature under its own imprimatur, during its early days. Examples are the *International Workers Order; History, Program, Tactics,* by M. Olgin; *A New Workers Stronghold,* issued by the National Executive Committee; *Class Struggle in Fraternal Organizations,* and for that matter, a good deal of material in the *New Order* up until about 1936. Since that period, although express mention of the revolution has disappeared from the I. W. O. publications, the communist propaganda is unabated. The very last issue of the *Fraternal Outlook,* that of June-July, 1950, contains a resolution by the general council heartily indorsing the Stockholm Peace Pledge. It would be difficult indeed to name a Communist party campaign that was not supported somewhere in the pages of the *New Order* or the *Fraternal Outlook.*

*Teaching communist doctrines in schools, camps and lodges.* There is ample evidence in the record also that communist doctrine was taught in the schools and camps maintained by the I. W. O. One of the witnesses for the petitioner, Simon Weber, whose forthrightness particularly impressed the court, was a teacher in one of the schools conducted by the I. W. O.

He taught the children about the October Revolution, Lenin's Memorial, the Paris Commune, etc. The basic doctrine was to grow up to be communists.

In addition to conducting schools, the I. W. O. also secured students for the workers' school of the Communist party and instructors from the workers' school were used in I. W. O. training schools.

*Other functions.* While the activities discussed above are the most obvious and spectacular ones serving communist ends, certain other activities carried on simultaneously appear to have been of equal, if not greater, importance. Those are the activities designed to mould the views and actions of the I. W. O. members. These activities included the dissemination through literature and other channels of the basic political and economic theories of communism and the application of these theories to current events and activities. Tied in with this was a campaign to develop the admiration and sympathy of I. W. O. members for the U. S. S. R. and its policies, as well as many campaigns on issues of civil rights, war, peace, and other current problems. To keep this decision within some bounds, the methods employed in these activities will be illustrated by reference to only one of the campaigns, that of fostering sympathy for the U. S. S. R. and support of its policies. The publications of the organization show clearly that with regard to international affairs the I. W. O. was at the very least " ideologically attuned " to the U. S. S. R. From its early publication the I. W. O. fostered an uncritical admiration of the U. S. S. R. as the epitome of all that is good and true and as the utopia to be striven for in the United States. In marked contrast is the attitude adopted toward the government officials and policies of this country. Any action, comment, or person deemed to be unfriendly to the U. S. S. R. is the subject of devastating criticism. The unswerving adherence to the U. S. S. R., its policies and interests, which runs through most publications of the I. W. O. is reflected by one significant change of policy. In April, 1939, the *Fraternal Outlook* pictures a stop-Hitler parade in New York in which the I. W. O. is said to have played a prominent part. In August, 1939, the Hitler-Stalin Pact was signed. Thereafter, with the outbreak of war in Europe, the I. W. O. and its general executive board, through the I. W. O. publications, were urging I. W. O. members and lodges into active participation in a campaign for peace and against war. War was pictured as being perpetrated by war mongers and munitions makers. Here is a significant quotation from an

article in the August, 1940, issue of the *Fraternal Outlook:* " In order to preserve that freedom, in order to preserve that Bill of Rights, in order to preserve all the great principles of the Declaration of Independence, the American people know that we must preserve the peace of the nation and to keep our boys out of the blood-soaked European battlefields. The International Workers Order is to be congratulated for carrying on the fight for peace." At the time that this article was written what was left of England was standing with its back to the wall and singlehandedly it was mustering its strength to thwart the devastating purpose of the Nazis. A careful examination of the publications of the I. W. O. fails to disclose one article which called upon the membership of the I. W. O. to help England fight against the onslaught of the Hitler forces.

On the contrary, the publications of the organization report participation by the I. W. O. units and members in peace demonstrations, meetings, and other activities for peace. The general theme of the I. W. O. publications was " The Yanks are not coming."

The picture suddenly changed, however, in 1941. In that year the U. S. S. R. was drawn into the war by an attack upon it by Hitler and the I. W. O. suddenly reversed its position. In July, 1941, the *Fraternal Outlook* printed a statement of the National Executive Committee: " By its attack on the peace-loving people of the U. S. S. R. Hitler has demonstrated there can be no possibility of peace   *   *   *   without the militant destruction of German fascism." The statement then outlined a militant program to urge on the President and Congress unlimited support and aid to Great Britain and the U. S. S. R. and also a plan to combat fascist propaganda and slander by the mass distribution of the book, " Soviet Power," by the Dean of Canterbury. The blood-soaked European battlefields no longer had any horror for the officials of the I. W. O. Thereafter the I. W. O. actively supported the war effort. Since the conclusion of the war the I. W. O. has continued its pro-U. S. S. R. line. It has swung back to urging its members to active participation in an offensive for peace, a campaign to outlaw the atom bomb, and to oppose military expenditures.

There have been other campaigns in which the I. W. O. took part where the immediate objectives were commendable, such as the Scottsboro defense, campaigns for bettering working conditions, social legislation, etc. In the light of the general pattern of the I. W. O.'s activities, the fact must be noted that most of these campaigns were also adopted and exploited by the Communist party for its own ultimate objectives.

The evidence also establishes that the tie of the I. W. O. to the Communist party and its activities on behalf of the party and in line with the party doctrines, were not a result of coincidence but were rather carefully planned and organized by the leaders of the I. W. O. The significance of the activities of the I. W. O. and its function in relation to the Communist party have been synthesized in the writings of Max Bedacht, General Secretary and a leading spirit of the I. W. O. from 1933 to 1947. In an article entitled " The Place of the I. W. O. in the Revolutionary Movement," appearing in the *Daily Worker* on February 2 and February 3, 1933, Bedacht states as a task of a broad mass movement built on the issues of mutual benefits:

" It must teach the workers, in the course of the struggle for social insurance that in the last analysis, all their many problems which grow out of the fact that they are workers, that they have only wages to live off, and that the chance to earn wages is beyond their control, is in reality a fundamental political problem — the problem of establishing a working-class rule in the place of the existing capitalist-class rule. * * * This problem (of making the workers class conscious) is of the greatest importance. * * * It is the major problem of Communist leadership in all non-party mass organization.

" There is a tendency on the part of many comrades to transfer all the conditions of membership in and all the tasks of the Communist Party, as well as the tasks of individual Communists, to every militant mass organization and its members. * * * Consequently the membership of these organizations becomes limited only to revolutionists. Instead of serving backward workers to develop them, this policy leads to repel and expel them from these organizations.

"The International Workers Order remains what it set out to be, an active proletarian Mutual Benefits Society. The development of its members into militant trade unionists or into Communists thus becomes a natural result of a correct functioning of the I. W. O. as an active workers' mutual benefit society * * * without a struggle for immediate improvements of the workers' conditions there can be no revolutionary struggle * * *.

" This, in the main, is the road of revolutionary development which the working class must travel. However, it does not travel this road mechanically and spontaneously. It must be led along this road. The task to lead them along this road is the task of the Communist Party. Revolutionary leadership does not begin at the end of the road, exercised only over the

revolutionary workers, it begins at the start of this road, exercised upon the broadest possible working masses, irrespective of their degree of revolutionary development. The strength of the revolutionary movement, therefore, depends upon the success the Communists have in organizing and leading mass struggles of the workers for concrete immediate issues and on the ability of the Communist to transform the experiences of these struggles into greater class consciousness of the workers. * * * The International Workers Order is a most important link in the chain of militant workers organizations in America. It has a right to demand from all Communists energetic efforts to build it into a broad mass organization. Its very immediate purpose makes it possible to bring to it even the most backward workers. It is an organization that allows Communists leadership to drive its roots into the unchartered depths of the American working masses where class consciousness has not yet penetrated. The building of the I. W. O. is, therefore, one of the most important tasks of the mass workers of the Communist Party.''

Again in a speech entitled '' Work and Mass Organizations,'' reported in the August-September, 1933, issue of the *Party Organizer,* a publication of the Communist party, Max Bedacht took to task those communists who did not see the importance of mass organizations. The article reads in part: '' I want to assure the comrades that while I am in the I. W. O. I am not away from the Party, but on the contrary when we succeed in putting all leading members of the Party into active positions of leadership, of real organized masses of workers, only then their leadership becomes reality and ceases to be an abstraction.'' Mr. Bedacht restated these purposes in more restrained language repeatedly in I. W. O. publications. There was evidence of many other similar statements as to the purposes of the I. W. O. made by the important and controlling officials of the I. W. O. Reference to them in detail would extend this decision beyond reasonable length. It can be said, however, in broad outline that these statements simply summarize explicitly what the activities of the I. W. O. establish in some detail and they show a conscious purpose on the part of the I. W. O. officials.

Further evidence of the conscious purpose behind these I. W. O. activities is furnished by the fact that the great majority of the officials of the I. W. O. are and have been active members and important officials of the Communist party. Max Bedacht, referred to previously, on the basis of his writings as

well as extrinsic evidence, was a very active and energetic communist of long standing. As mentioned above, he was a general secretary and leader of the I. W. O. for fourteen years.

Others among the founders and early officers who have been identified as communists are William Weiner, who was president from 1931 until 1944. In the latter year he was indicted for a passport fraud and upon the insistence of the Insurance Department he was removed as president of the order. Weiner was a very active member of the Communist party of the United States for years and its treasurer for a number of years. Joseph Brodsky, who was general counsel of the order, was one of the incorporators and first treasurer. The evidence clearly shows him to have been a communist. Others among the founders and early officers who have been identified as communists are Boleslaw Gebert, vice-president of the I. W. O. from 1944 to 1947 and president of the Polonia Society, now reported to be an official of the Polish regime, and Herbert Benjamin, national secretary from 1940 to 1943. Without naming further of these past officers, it must be observed that nine of the original incorporators have been identified as members of the Communist party and as late as the years 1935 to 1938 every national officer was identified as a member of the Communist party, as well as every secretary of every national society composing the subordinate branches of the I. W. O.

The picture as of today has not changed. Of the ten present national officers, nine have been identified as members of the Communist party. Of these nine, eight have refused to answer questions as to their membership in the Communist party on the ground that their answers might tend to incriminate them but the evidence points convincingly to the fact of their membership in the Communist party. The other, Rockwell Kent, the present president of the order, denied that he is or ever has been a member of the Communist party. Quite apart from the matter of his membership, his writings reveal a very active sympathy with and support of communist ideas and the U. S. S. R. Among the present ten national officers, six have been identified as *active* Communist party members. Of these six, five were further identified as having participated in key Communist party committees. These include Rubin Saltzman, vice-president; Louise Thompson Patterson, vice-president, who not only claimed privilege but who even went so far as to refuse to identify a picture of herself in order to make difficult her identification as a communist; Peter Shipka, general secretary and treasurer of the order; David Greene, former national youth

organizer of the I. W. O. and now recording secretary, whose speech at the communist convention has been referred to above; Samson Milgrom, executive secretary, a position which perhaps carries the greatest influence in the order; John E. Middleton, vice-president and executive director of the general lodges; Bronislaw Wojkowski, vice-president of the Polonia Society, and Nahum Polak, assistant treasurer.

It must also be observed at this point that of the twenty-two members of the executive committee, sixteen have been identified as members of the Communist party. These sixteen are also the leading and guiding spirit of the various nationality groups.

Still further evidence of control of the I. W. O. is furnished by reference to the nationality commission which represents the various nationality groups embraced within the I. W. O. The I. W. O., as heretofore pointed out, is composed largely of language groups.

In its early years the growth of the I. W. O. must be ascribed at least in part to its merger with other multinational revolutionary fraternal societies such as the Hungarian Workmen's Sick Benefit and Educational Federation, the Slovak Workers Society and the Russian National Mutual Aid Society. While the general secretary and treasurer of the I. W. O. ascribed various economic and social reasons for the mergers of these organizations with the I. W. O., it is clear from a reading of the articles written by the responsible representatives of these three societies that its purpose was to establish a single mass organization into which could be gathered the communist elements of the various nationality groups in the United States.

Each of these nationality groups falls under a corresponding language bureau of the nationality commission which through the leading fraction of the I. W. O. language groups, directs that group as to questions peculiar to the problems of the nationality. Because of the party organization, the instructions from language bureau to language section do not conflict with the general policies given by the political bureau of the party to the top fraction of the I. W. O. national organization.

Reference has already been made to the fact that each of the important heads of the various nationality groups serves on the executive committee, which is the all-powerful governing body of the I. W. O., together with the national officers. Each of these sixteen heads of the nationality groups is a paid official of the I. W. O. receiving upwards of $3,000 a year. It can thus be seen how comparatively easy it has been for the Communist

party to exercise its control over the I. W. O. In the first place, we have the established fact that nine executive officers of the I. W. O. are communists and many of them are active in the Communist party affairs. This constitutes the top echelon. Then there is the executive committee of twenty-two members, sixteen of whom are communists and are simultaneously the heads of the various nationality groups. This is the second echelon, though equally important with the first. The two together are a closely knit body guided, directed and controlled by communist policy and communist leadership.

Aside from the evidence here alluded to, most of which springs from the official acts and publications of the leading officials of the I. W. O., the petitioner offered in evidence the testimony of thirteen former members of the Communist party and former members of the I. W. O. who testified with respect to the Communist party domination over the I. W. O. and the activities generally of the I. W. O. Their testimony supports the evidence contained in the I. W. O. publications and fills in the details of the operating ties between the I. W. O. officers and executive committee on the one hand and the organization of the Communist party on the other hand.

The respondent called twenty-three witnesses. These included two officials of the Insurance Department, six national officers, and fifteen ordinary members of the I. W. O. Testimony in the form of affidavits of 113 other members of the I. W. O. was received in evidence. Its tenor was similar in import to that of the oral testimony.

In the examination of the officials of the Insurance Department, the respondent attacked the motives in this investigation, sought to show that the examiner's conclusions and recommendations were not supported by the evidence he had assembled, that the class consciousness was a natural result of the nature of the organization as a workers' group, as was the advertising in the *Daily Worker*, that the examiner had omitted large numbers of the cultural, social and charitable activities of the I. W. O. This testimony was admitted by the court on the insistence of counsel for the I. W. O. and for the independent policyholders committee, their contention being that since the motives of the Superintendent of Insurance, acting through the examiner, were improper, the entire proceeding should be dismissed. The further purpose of this testimony was, as contended for the respondent, to show that the Superintendent of Insurance was unfair in that his representatives had conducted a one-sided exploration into the affairs of the I. W. O. and that

had he taken into consideration the other activities of the
I. W. O., which did not form the basis of the report of the
examiner or the findings of the deputy superintendent, the
superintendent would then have been forced to the conclusion
that the I. W. O. had strictly conformed not only to its charter
provisions but to the stated purposes in the articles of
incorporation.

Accordingly, a large mass of material was admitted in evi-
dence on behalf of the respondent tending to show that it had
engaged in many worthy undertakings, undertakings which are
harmless in concept and for the general welfare of the com-
munity. Specifically, the I. W. O. officials testified at length
as to the formation of the I. W. O., its concept of a real frater-
nalism, the financial operations of the organization, the activities
of the national organization and the lodges, the extensive work
it had done in providing benefits and aid for its policyholders,
the large contributions it had made to charitable organizations,
its large purchase of treasury bonds, its work against racial
discrimination and anti-Semitism, in behalf of civil liberties, and
the social and fraternal aspects of its activities. As to these
they testified openly and fully. However, as to the main issues
raised by the petitioner, namely, the basic political objectives
and activities in line with communist purposes and program and
its ties to the Communist party, the answers were evasive and
unconvincing. In many instances all of the officers of the order,
with the exception of one, threw the cloak of immunity around
themselves and refused to answer pertinent questions which
would have assisted the court in determining the basic charges
of the superintendent but, instead, claimed that to answer would
tend to incriminate them. While the court was of the opinion
that this claim, repeatedly asserted by all the officers of the
I. W. O. except one, was not made in good faith, nevertheless
the claim was sustained because of the desire of the court not
to permit answers by the officers which they and their counsel
thought might perhaps in some other proceeding or prosecution
tend to incriminate them.

However, their own writings and speeches and activities in
the past have so completely incriminated them that it is doubtful
whether any of their testimony at this hearing would have
added to such jeopardy as they might find themselves in at the
present time.

In each instance, when presented with evidence of participa-
tion in Communist party activity, by I. W. O. officials or com-
mittees of I. W. O. officials, the activity was ascribed to the

I. W. O. officials personally and not to the I. W. O. To point to one instance, a committee of I. W. O. members was formed to aid the *Daily Worker*. This committee published an appeal for funds in *The New Order* of November, 1937. According to Saltzman, Greene, and Shipka, this was just a committee of twelve individual members who decided to support the *Daily Worker*. The membership of the group, however, contains every national officer then in office, except one. One naïve in the ways of the world and one completely untutored in matters legal, would be hard put to conclude that the rather high-powered individuals comprising the entire national officer staff were acting solely in their individual capacities and not as representatives of or in their official capacity as officers of the I. W. O.

The ordinary members testified as to the superiority of the insurance benefits received from the I. W. O. and the importance of these benefits to them, the varied social and fraternal activities carried on, and the absence of any political activities in their lodges.

The testimony of the respondents, as a whole, failed to meet and refute the charges made by the Superintendent of Insurance. Its evidence established that the I. W. O. did carry on an insurance function and that there was much fraternal, social, and charitable activity engaged in by the I. W. O. and its subordinate lodges. In addition, work which it did in behalf of civil rights and labor organization, while political in nature, had commendable immediate objectives if, of course, the purpose and intent were proper. Furthermore, there is no doubt from the evidence that many members of the I. W. O. lodges came in solely because of the insurance benefits or social and fraternal participation and were not communists or even clearly aware of the ties between the I. W. O. and the Communist party. However, this evidence does not overcome or even equal the evidence of the Superintendent of Insurance establishing the fact that the leadership and direction of the I. W. O. was communist, and that the immediate objectives of the insurance and fraternalism were means toward developing a wide organization of workers which, under communist guidance, could be developed from their political views into adherents of the communist program. Even if many of the members may have been unaware of any of the objectives beyond those immediate objectives for which they joined, the organization took its character and meaning not from these innocent members but from the leaders and the program they carried out, making use of the innocent as well as the more politically astute members. It is difficult to

escape the conclusion, based upon the overwhelming weight of the evidence in this case, that the insurance and social reform activities of the I. W. O. were with calculated design contrived to lure into the order the great mass of workers and thus expose them to communist teaching and doctrines and bring them within the sphere of the Communist party.

In avoidance of the evidence of the campaigns and activities of the I. W. O. in support of Communist party candidates, the communist newspapers, and other communist campaigns, and the dissemination of communist literature and the propagation of the " faith " to the end of acting as a transmission belt, and the domination of the I. W. O. by the Communist party, the only evidence offered was the opinion of the witnesses that these were all personal activities of the leaders and not attributable to the I. W. O. This argument is not supported by the facts. Insofar as the I. W. O. or any corporation has any life and being, it functions through its officers and agents. In this case the pro-gram of activities was carried on openly and publicly by all the top officers of the I. W. O. over a period of twenty years, which program was carried out through I. W. O. meetings, publica-tions, and membership. These people were elected and re-elected to carry on this work. This is not a case of a few politically minded members acting beyond the scope of their authority in an excess of zeal, nor of certain individuals acting on their own from time to time and in isolated instances. This was a case of the majority of the officers and members of the executive committee directing the organization, carrying on their activities openly for a period of twenty years, with the membership of the organization accepting and participating in these activities, and re-electing these people to office. It is clear from the evidence that these activities represented no individual frolic of the officers, no sporadic excursion into social activities, no intermittent campaigns for social betterment, but constituted an essential part — a persistent and a consistent part — of the corporate activity during the period in question. Under these circumstances the corporation cannot disavow this course of conduct nor responsibility for it on the ground that it was not authorized by formal resolution of the governing body. (*People* v. *Hudson Vall. Constr. Co.*, 217 N. Y. 172; *People* v. *North Riv. Sugar Refining Co.*, 121 N. Y. 582; *Matter of Movietime* v. *New York Tel. Co.*, 277 App. Div. 1057.)

In the *North River Sugar Refining* case (*supra*) the Court of Appeals held that a corporation could not disclaim the acts of its officers done with full knowledge of all the responsible people

in the organization and continuing over a period of years. The court said (p. 622) that when the individuals' acts have reached " results and accomplish purposes clearly corporate in their character, and affecting the vitality, the independence, the utility, of the corporation itself, we cannot hesitate to conclude that there has been corporate conduct which the state may review, and not be defeated by the assumed innocence of a convenient fiction." The convenient fiction, of course, referred to the attempt to relieve the corporation of liability because of individual acts of the officers and those in control. Language and ruling more appropriate to the instant situation would be difficult to find.

This analysis of this part of the evidence introduced is unusually long and exhaustive. However, the court is keenly aware of the fact that the judgment of the court will itself be judged in the light, or rather the heat, of the strong passions that surround the subject of communism today. It therefore seems useful in such cases for the court to present not only conclusions but to state the facts from which these conclusions flow. To analyze and weigh objectively the facts as to activities which are inimical to our way of life and our form of government is a difficult exercise in self-discipline but a very vital one; to give way to a wave of hysteria and antipathy and to abandon the principles of impartial and objective judgment, is to endanger the vitals of our democracy far more than any outside enemy can.

The facts which have been presented above make inescapable the conclusion that the I. W. O. has functioned as a political organization, attracting workers by providing insurance benefits and thereafter subjecting them to a process of political education along communist lines, involving them in the militant political activity of the I. W. O. and of other kindred groups, including the Communist party itself.

We come now to the principal legal issue presented by this case: whether on the basis of these facts this court may and should order the liquidation of this corporation. The petitioner contends that the court should order the liquidation because (1) the further transaction of business by the I. W. O. will be and is hazardous to its policyholders, to its creditors, and to the public within the meaning of the provisions of paragraph (e) of section 511 of the Insurance Law, and (2) that it has willfully violated its charter and the laws of this State (Insurance Law, § 511, par. [f]) and, specifically, the Smith Act (U. S. Code, tit. 18, § 2385), sections 160 and 161 of the Penal Law, and sections 463 and 465 of the Insurance Law.

As to the first ground the statute provides that " The superintendent may apply under this article for an order directing him to rehabilitate [dissolve] a domestic insurer upon any one or more of the following grounds: that such insurer (a) is insolvent within the meaning of section ninety-three; * * * or (e) is found, after an examination, to be in such condition that its further transaction of business will be hazardous to its policyholders, or to its creditors, or to the public ". The respondent urges in effect that the use of the word hazardous in this section refers solely to imminent or actual insolvency arising out of the insurance business operations, that where, as in this case, the corporation is solvent and is in sound financial condition it cannot be liquidated under paragraph (e) of section 511 and section 513 of the Insurance Law. The respondent also contends that even assuming that the I. W. O. presented a hazard as the word used in its ordinary meaning connotes, the Superintendent of Insurance is powerless to act in the circumstances. There is no basis for reading such a severe limitation into the words of the statute. All of the indications are, on the contrary, in favor of a broad construction of the language of the Insurance Law to give the superintendent effective control over the complex structure and operation of insurance companies.

The business of writing insurance has long been recognized as a business affected with a public interest and, therefore, subject to detailed regulation by the State for the protection of the public. The organization of an insurance company and the conduct of the business of writing insurance is not a right; it is a privilege granted by the State subject to the conditions imposed by the State and to its control and supervision (*German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389; *People* v. *Formosa,* 131 N. Y. 478; 1 Couch's Cyclopedia of Insurance Law [1929 ed.], § 244).

In the *Formosa* case (*supra*) the Court of Appeals said, among other things: " Life insurance companies perform very important functions in modern society. They operate in all parts of the state, and a very large number of people are interested in them. They are resorted to for the purpose of making provisions for families and dependents after the death of the insured, and for that purpose many persons invest in them the accumulations of their labor and their thrift. The nature of insurance contracts is such that each person effecting insurance cannot thoroughly protect himself. He is not competent to investigate the condition and solvency of the company in which he insures, and his contracts may run through many years and

mature only, as a rule, at his death. Under such circumstances, it is competent for the legislature, in the interest of the people and to promote the general welfare, to regulate insurance companies and the management of their affairs, and to provide by law for that protection to policyholders which they could not secure for themselves. Under such conditions there should be a *wide range of legislative power to promote the public welfare in the exercise of the police power, and the true boundaries of that power it would be difficult in such a case to prescribe.*" (Pp. 482–483. Italics mine.)

To confine, therefore, the word " hazardous " in this statute to mean simply financial hazard, that is, imminent or actual insolvency, would be placing a construction on the statute clearly not contemplated by the act.

Most States have enacted broad legislation giving wide power to their insurance departments. New York, in accord with the majority, has enacted a very comprehensive and detailed Insurance Law. A reading of the provisions of this law show that the Legislature's interest is not limited to the solvency of insurance companies but extends to the details of the management, internal organization, practices and personnel. This interest is particularly marked with regard to fraternal benefit societies. Article XIV of the Insurance Law regulating fraternal benefit societies covers in detail the functioning of the internal organization. A fraternal benefit society is defined as a nonstock corporation organized and carried on " solely for the benefit of its members and of their beneficiaries and not for profit". It is required to operate on a lodge system with lodges holding meetings at least once a month and to conduct ceremonies to initiate members or " to carry on other altruistic, educational, fraternal or recreational activities ". It is required to have a representative form of government and there are detailed regulations as to its conventions, the election of delegates by members and a provision against voting by proxy at meetings of the governing bodies.

In addition there are those regulations relating to its insurance operations involving the kinds of benefits, the rights of beneficiaries, classes of membership, contents of certificates and other matters. These are cited in some detail since they show clearly that the Legislature's concern is not only with the solvency of these corporations organized and operating under the Insurance Law, but also with their nature, objectives and their function as representative fraternal organizations. The requirements of the law being thus explicitly stated, it follows

that the Superintendent of Insurance has the duty of enforcing these requirements by appropriate action in accordance with law. While the cases which have arisen heretofore under paragraph (e) of section 511 and section 513 have usually involved actual or imminent insolvency, this does not preclude the application of these sections to other hazards as they arise in proceedings before the court.

The Court of Appeals in *Matter of Attorney-General* v. *North Amer. Life Ins. Co.* (82 N. Y. 172) affirmed the principle that the State has the power to put in receivership even a solvent insurance company where its management, credit and condition are such that it might be injurious to the public interest to permit it to continue its business. (See, also, *Merchants Mut. Auto Liability Ins. Co.* v. *Smart*, 267 U. S. 126.) The State Legislature has exercised this broad power in the enactment of the Insurance Law and vested the Superintendent of Insurance with the " rights, powers and duties as expressed or *reasonably implied* by this chapter, in connection with the business of insurance in this state " (Insurance Law, § 10). To limit this power to imminent or actual insolvency and to the operations of insurance function alone, would be contrary both to the plain language and intent of the statute. Any doubt with respect to this statutory interpretation is completely removed by the investiture of the superintendent with the implied power to carry out the purpose of the statute.

The evidence as to the activities and operations of the I. W. O. establishes that its continued operations would be not only hazardous to its policyholders, its creditors and to the public but that its continued operation would constitute a potential hazard to the solvency of the I. W. O. In its functioning the insurance operations of the I. W. O. have become indisolubly linked and subordinated to its political purposes and program. The provisions of the fraternal benefit society law list the permissible objectives, all of which by their nature present no danger to the insurance function. The introduction of any competing or superseding objective presents an obvious danger to the policyholders of any insurance company. Where the competitive or superseding objective is a political faith linked with a party whose leaders have been convicted of advocating the overthrow of the Government by force and violence and is " ideologically attuned " to a foreign power now engaged in controversy with this nation, the fortunes of insurance functions are indeed hazardous. There is the obvious risk that when the ultimate political purposes so require, the insurance functions

will be deliberately sacrificed in whole or in part or will otherwise suffer from changes in political fortunes.

The I. W. O. has, by its own allegations, suffered a loss of membership due to its inclusion on the Attorney-General's list of subversive organizations. This listing was ruled out as evidence of the nature of the I. W. O. by this court, as previously pointed out, early in the trial because of the absence of the basic elements of due process in the preparation of the list. However, the inclusion on this list, whether or not justified, is a direct result of the respondent's involvement in political activities and illustrates the inherent hazard of mixing politics and insurance.

It has already been observed that over 97% of the order's assets are in the form of cash and Government bonds. Obviously there is nothing wrong or sinister about liquid assets as such. Nevertheless, one desiring to misappropriate assets can do so more easily if they are liquid. It would appear, therefore, that since the I. W. O. is dominated and controlled by the Communist party and that the responsible officers of the I. W. O. are active Communist party members and that the assets of the I. W. O. are liquid, there is a substantial financial hazard, potential if not otherwise. If the time arrives when there is a conflict between the interests of this country and the world of communism, it is not beyond the realm of reasonable probability that the funds of this order will be expropriated. In the light of the overall picture as this court sees it and taking into consideration the activities of the order over a period of twenty years, the conclusion is irresistible that the present situation presents a definite hazardous position in which the I. W. O. finds itself from the standpoint of its policyholders, the creditors and the public within the meaning of the appropriate provisions of the Insurance Law.

Pertinent here is the observation of the Court of Appeals in *Matter of People* v. *Second Russian Ins. Co.* (243 N. Y. 524). That case, as this court reads it, stands for the proposition that the financial hazard which affords a ground for liquidation under paragraph (e) of section 511 need not be one of immediate insolvency because of the insurer's internal affairs. It is sufficient if external facts create a likelihood of insolvency in the future. In that case the insurance superintendent applied to the court for an order empowering him to take over the property and assets of the Second Russian Insurance Company on the statutory ground that further transaction of business would be hazardous to the policyholders, the creditors and the public.

The superintendent urged there that the company was insolvent. The contrary was true. It appeared that the Soviet Government had taken over control of the parent company of the Second Russian Insurance Company. The court at Special Term, Part I (N. Y. L. J., April 25, 1925, p. 353, col. 5), in language peculiarly applicable here said:

" Depending, as it singularly does, on the financial state of the company's affairs and *its commitments, present and contingent,* no precedent not based on the exactly similar factual situation can control. [Italics mine.] Aside from purely legalistic conceptions of the continued existence of the former regime in Russia, by virtue of political non-recognition of the present, the situation is nevertheless one where admittedly at the place of the corporation's creation it is non-existent, in the sense that activity has been frustrated, and confiscation, actual and not theoretical, taken place by nationalization. It is, to say the least, extremely problematical that the Soviet Government intends to use the assets confiscated in the furtherance or protection of the company's business here. The loss of confidence and faith necessarily resulting from frustration abroad restrain the obtainment of further business here, as also the dispute respecting the *de jure* directorate. In addition, the remittance to a newly organized company organized and controlled by one faction in Norway, together with the apprehension of assignment of claims from foreign creditors to residents of the United States for the purpose of making them chargeable against the assets here, and other circumstances appearing in the moving papers, disclose a condition, though unfortunate and in part due to causes beyond the control of the directors, warranting the granting of the order placing the assets and funds in the possession of the superintendent of insurance for liquidation in the manner provided by statute."

Thus it will be perceived that the situation was brought about because of the nationalization of the parent company in Russia and the Court of Appeals held that under such circumstances the transaction of business of the subsidiary in this country effected a hazard which required that the Superintendent of Insurance take possession of the assets of the subsidiary in this State — this in spite of the company's solvency.

The factual picture here is analogous. The I. W. O. is solvent at present but the activities of the controlling officers of the I. W. O. in their relationship with the Communist party, are of such a character that a real hazard is present which requires action by the Superintendent of Insurance.

An even greater danger now faces the I. W. O. In recent decisions, the Federal courts have determined the illegality under the Smith Act (U. S. Code, tit. 18, § 2385) of the objectives and activities of the Communist party. (*Dennis* v. *United States*, 341 U. S. 494.) The I. W. O. by its active participation in the program of the Communist party with full knowledge of its nature may be found to have offended similarly. The effect of a prosecution would be calamitous to the policyholders and creditors. The mere prospect of it raises a serious threat of decline in membership and a serious threat to its financial structure.

The right of the Communist party to function as a political party is not an issue before this court, nor, as respondents have argued, the right of members of fraternal societies to hold communist views. The question here involved is whether under the laws of the State of New York a political group may organize in the guise of a fraternal benefit society and carry on its political activities using the facade of its insurance functions. Subjecting an insurance function to a competing political objective, whether Republican, Democratic or Communistic in nature, creates a hazard to the insurance functions. Insofar as the Communist party is a more highly organized and aggressive one, committed to achieving its objectives without regard to the legality of means the danger of unauthorized or illegal activity is greater.

These then are the facts which demonstrate inescapably that the I. W. O. " is in such a condition that its further transaction of business will be hazardous to its policyholders, its creditors and to the public." Such an interpretation does not, as respondents contend, result in an unconstitutional delegation of legislative power. It is manifestly impossible for the Legislature to set out in detail every condition of a complex insurance business which may create a hazard and yet it is vitally necessary that the officer charged with responsibility of safeguarding public interest in insurance business be empowered to investigate the hazards, in whatever form they arise and present the facts to the court for action. The courts have long recognized that the Legislature may, and indeed in many cases, has no alternative, enact statutes in broad outline, leaving to administrative officials enforcing them, the duty of arranging the details and that such delegation is not unconstitutional (*Matter of Nat. Sur. Co.*, 239 App. Div. 490, affd. 264 N. Y. 473).

Another ground urged by petitioner for dissolution is that the I. W. O. has willfully violated its charter and that this viola-

tion is a serious and fundamental one. Paragraph (f) of section 511 provides as a ground for liquidation that an " insurer has wilfully violated its charter." This is simply a restatement of the principle of the common law and the effect of the section is to designate the Superintendent of Insurance in regard to insurance corporations as the officer of the State who will seek redress when the State's corporate creatures abuse their powers or offend against the law of their creation.

The principle is a broad one stemming from the facts that a corporation owes its very existence to the State which created it; that corporations are created for the benefit of the public and if their conduct sufficiently jeopardizes the welfare of the public their charters may be forfeited. (*Chicago Life Ins. Co.* v. *Needles,* 113 U. S. 574; 16 Fletcher's Cyclopedia, Corporations [Perm. ed.], § 8055.) This principle underlies the holding of the Court of Appeals in *People* v. *North Riv. Sugar Refining Co.* (121 N. Y. 582, *supra*). The State sought to vacate the charter of a company which entered into a trust agreement with other companies. The questions to be answered were set out by the court:

" Two questions, therefore, open before us: first, has the defendant corporation exceeded or abused its powers, and, second, does that excess or abuse threaten or harm the public welfare.

" The first question requires us to ascertain what the defendant corporation has done in violation of its duty, or omitted to do in performance of its duty. We find disclosed by the proof that it has become an integral part and constituent element of a combination which possesses over it an absolute control, which has absorbed most of its corporate functions, and dictates the extent and manner and terms of its entire business activity. Into that combination, which drew into its control sixteen other corporations engaged in the refining of sugar, the defendant has gone, in some manner and by some process, for as an unquestionable truth we find it there." (Pp. 609–610.)

In reaching a decision the court did not separate illegality of action from injury to the public. " It is quite clear that the effect of the defendant's action was to divest itself of the essential and vital elements of its franchise by placing them in trust; to accept from the State the gift of corporate life only to disregard the conditions upon which it was given; to receive its powers and privileges merely to put them in pawn and to give away to an irresponsible board its entire independence and self-control. * * * In all these respects it has wasted and per-

verted the privileges conferred by the charter, abused its powers, and proved unfaithful to its duties." (Pp. 622–623.)

Surely, here, in the light of the facts already alluded to, the I. W. O. exceeded or abused its powers. And its abuse of powers threatens the public welfare. Furthermore, here too as in the *North River Sugar Refining* case above it is quite clear that the effect of the defendant's action was to divest itself of the essential and vital elements of its franchise by placing them in the hands of the Communist party. It is also true that here the I. W. O. accepted " from the State the gift of corporate life only to disregard the conditions upon which it was given; to receive its powers and privileges merely to put them in pawn, and to give away to an irresponsible board its entire independence and self-control." When the officers and responsible heads of the I. W. O. abdicated in favor of the Communist party it did exactly that which the Court of Appeals held illegal in the *North River Sugar Refining* case (*supra*) and in doing so it wasted and perverted the privileges conferred by the charter, abused its power and proved unfaithful to its duties and to its trust and invited this proceeding by the superintendent.

We have already observed what the permissible activities and functions of a fraternal benefit society were; namely, altruistic, fraternal and recreational. The I. W. O. charter in setting forth its purpose carefully adheres to the statutory formula. The provisions of the original charter carry the same formula. This formula was inserted despite the fact that the official publications were announcing its formation as a revolutionary group with a clearly delineated program; it was retained for twenty years although other amendments were made to this section while these political activities continued.

It follows that the charter of the I. W. O. does not contain and never has contained a true statement of its purposes. Hence, the original filing of the charter was in violation of section 463 of the Insurance Law. Thus in its very genesis it perpetrated a fraud upon the State. Ostensibly it was to be a fraternal benefit society; actually it was intended as and did in reality become a political front for a revolutionary group which was to follow a clearly prescribed political program. In fact, the role which it was to play had far greater significance in the contemplation of its communist organizers. It was to become, in effect, the alter ego of the Communist party if that party was to be declared illegal or if it served better ends to function through a purportedly respectable front as the I. W. O. Reference to an official document of the I. W. O. makes this abundantly clear:

" Let's now assume a situation where the Communist Party is illegal. This is very easily possible. This underlies the whole political persecution policies of the government. When the Party is underground, she cannot mobilize itself very quickly; often, because of repression, it is impossible for her to organize political demonstrations. Will the International Workers Order under such circumstances sit back quietly and not do anything? Will it not take the initiative to start and continue a mass struggle revolving around any political demand which has a relationship to the working class? * * * We learn from this that the International Workers Order occupies politically speaking, an unusual position. It is on the battlefield of the political war, but it does not occupy the front trenches. The International Workers Order is a part of the entire army which is fighting the war, but it is not the advance guard. Neither is it the rear guard. In exceptional cases it will come out in the front line of fire. But more often it finds itself in the rear ranks, strengthening with its battalions and with all its resources the entire fighting front.''

How well the ends have been served is eloquently demonstrated by the record in this proceeding. In the face of fraud of unconscionable magnitude, practiced upon the State of New York by the I. W. O. from its very inception and on the basis of the other persuasive grounds discussed earlier in this opinion, the court will not hesitate to aid the Superintendent of Insurance in his justifiable action to have dissolved the corporate existence of the I. W. O. A clearer case for judicial interference would be difficult to find. The duty to act therefore is compelling unless the court would abdicate its function.

The petitioner also alleges violations of the Smith Act hereinbefore referred to and the Criminal Anarchy Act of New York (Penal Law, §§ 160–166). There is clear evidence that the I. W .O. maintained close ties with the Communist party knowing its purpose to teach, advocate and encourage the overthrow and destruction of the United States Government by force and violence; that the I. W. O. aided the Communist party in carrying out its program and circulated and distributed its literature advocating the overthrow of the Government. Such activity may in another forum be held to constitute a violation of both the Smith Act and the State Criminal Anarchy Act. The hazards created by these violations have already been referred to above.

It is not necessary nor proper that the Superintendent of Insurance await conviction for these violations before proceeding under the provisions of the Insurance Law (*Standard Oil*

*Co.* v. *Missouri,* 224 U. S. 270; *People* v. *United Medical Service,* 362 Ill. 442; *People* v. *Blue Rose Oil Co.,* 360 Ill. 397; *Miller* v. *Minneapolis Underwriters Assn.,* 226 Minn. 367; *State* v. *Capital City Dairy Co.,* 62 Ohio State 350, affd. 183 U. S. 238). The position of the superintendent is not that of enforcer of these laws but under the Insurance Law to protect the policyholders, creditors and public against such violations. If he were required to await conviction it might be too late for him to act effectively in many cases.

It has been suggested by the respondent that violation of the Smith Act does not fall within paragraph (f) of section 511 because that act is a Federal law and hence not a law of the State. However, clause 2 of article VI of the Constitution of the United States provides: '' This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'' Indeed, the Federal law is as much a law of the State as any specific law enacted by the State Legislature. The distinction sought to be drawn between the two by the respondent is a specious one.

The cases cited by the respondent for the proposition that a corporation's charter may not be revoked prior to conviction are distinguishable. There are three types of such cases. The first is that in which a statute provides expressly that upon conviction of a certain offense a corporation shall, in addition to payment of fines, forfeit its charter. Such a case was *Commonwealth* v. *Kentucky Jockey Club* (238 Ky. 739). A second class of cases is found in situations in which a penal statute is expressly made applicable to the officers and agents of a corporation (see *People* v. *Atlantic Ave. R. R. Co.,* 57 Hun 378, affd. 125 N. Y. 513). The third class of cases is that in which the court finds the statutory violation to be so minor that charter forfeiture is not an appropriate remedy. (*Commonwealth* v. *United Warehouse Co.,* 293 Ky. 502).

The respondent early in the proceedings raised a number of additional objections in connection with these proceedings which may be dealt with as a group. In these proceedings the court sits as a trier of facts as presented by the petitioner and the respondent. It is not limited to the allegations in the report of the examiner or those adduced by the hearing before the superintendent, nor is it bound by the conclusions or recommendations of the Superintendent of Insurance. Any valid

objection to the content of the examiner's report on the ground of inclusion of material of questionable probative value was met by the amendment of the report after the hearing before the deputy superintendent. In addition, the court refused to consider any evidence in this case which did not strictly conform to the rules of evidence laid down by the courts of this State.

All of the requirements of due process have been fully met. The respondent had ample notice of the charges against it and of the contents of the report. It availed itself of the right of a hearing on this report as a result of which certain portions of the report have been stricken out. It has had full opportunity before this court to hear the evidence of petitioner, to test it by cross-examination and to introduce its own evidence. The objections which it raised to the proceeding, present no questions of any substance.

The Statute of Limitations is no bar in this case since here we have a course of conduct continuing up to the very commencement of these proceedings and furthermore a basic element of fraud.

The respondent also contends that the superintendent has failed to exhaust all available remedies; that he should first have requested removal of the untrustworthy officers of the I. W. O. or applied for an order of rehabilitation. Section 513 provides that the superintendent may apply for liquidation "regardless of whether or not there has been a prior order directing him to rehabilitate such insurer." Nevertheless, in view of the large number of small policyholders involved in the I. W. O. the court has given considerable thought to the possibility of rehabilitating this organization. After much consideration it is forced to conclude that its affiliation with the Communist party and the program cannot be eradicated by the removal of some or all of the leaders who are Communist party members nor by rehabilitation. The virus has spread too far and has polluted the entire corporate body. Mere excision of parts of that body would now be ineffectual. The only remedy lies in complete dissolution of that body. The I. W. O. has adopted a working principle which in over a period of twenty years of active exercise has had a profound influence on the character of the organization, its membership and its operations. Legitimate existence is no longer possible. This organization cannot be reduced to a simple fraternal benefit society which it was required to be under the laws of the State and by its very charter.

It has been urged, perhaps not with seriousness, that the superintendent has by his prior failure to institute a proceeding

against the I. W. O. in some way estopped himself from doing so now. It is clear to this court that no past course of forbearance by the superintendent can affect his right and duty to proceed for a liquidation when such a proceeding is indicated (see *Matter of People* [*St. Cecilia Service Club*], 194 Misc. 999, and *Van Schaick* v. *Cronin*, 237 App. Div. 182). Moreover, many of the wrongs complained of by the superintendent do not come within the orbit of past history but exist right down to this very time.

. It should be pointed out that the present proceeding involves no unconstitutional abridgement of freedom of speech, press or assembly. The present proceeding in no way operates to affect any of these vital constitutional guarantees, and no such interpretation can be read into the disposition here made. Any or all of the officers of this order or employees have the right to go upon the highways and byways and speak their minds, write as they please, and assemble without molestation to express their grievances or for other lawful purposes. They may not, however, by a claim of constitutional guaranty, commit the I. W. O. officially as they have done by their writings and speeches to a perversion of the charter privileges and to a political program dominated by foreign ideologies which have by the highest court in the land been declared to be inimical to the interests of the people of this country and to present a '' clear and present danger.'' The constitutional guaranty of freedom of speech, press and assembly was never intended as a license for illegality nor an invitation for fraud. In this case its highly desirable concept and principle have been contorted and emasculated by the leaders, officers and controlling influences in the I. W. O.

It follows therefore that the Superintendent of Insurance is entitled to an order of dissolution and liquidation of the I. W. O. Every legitimate interest of the policyholders will be safeguarded and maximum protection will be afforded to all interested parties by court supervision and direction.

A stay of dissolution and liquidation will be granted on condition that the respondent proceeds with due diligence to prosecute an appeal from the order to be entered herein. In the meantime, the officers and other officials of the respondent are directed to deliver forthwith to the Superintendent of Insurance all books, papers and documents which concern the affairs of the I. W. O. In other respects the temporary restraining order heretofore signed will remain in full force and effect.

Settle order on June 27th at 11:00 A.M.